# EXHIBIT "C"

**AMERICAN ARBITRATION ASSOCIATION**

```
------------------------------------------------------------ x
                                                             :
MADISON BRENGLE,                                             :
                                                             :
                              Claimant,                      :
                                                             :      DEMAND FOR ARBITRATION
                 v.                                          :
                                                             :
WTA TOUR, INC.,                                              :
                                                             :
                              Respondent.                    :
                                                             :
------------------------------------------------------------ x
```

Claimant Madison Brengle, by her undersigned attorneys, for her Demand for Arbitration against Respondent WTA Tour, Inc. ("WTA"), alleges as follows:

**<u>Nature of the Action</u>**

1.      This is an arbitration demand by Brengle, a professional female tennis player, to hold Respondent responsible for its outrageous conduct in subjecting Brengle to anti-doping blood testing using needles despite Respondent knowing and ignoring that Brengle suffers from a rare but medically-diagnosed physical condition which results in both temporary and permanent physical injury, emotional trauma, and pain and suffering from having a needle inserted into her vein, and thereafter extracting punishment by repeatedly and continuously, including at the time of the filing of the instant pleading, harassing Brengle following her challenge to this conduct.  As a result of Respondent's bullying behavior and actions toward Brengle, which caused her to suffer professionally and personally, Brengle no longer has normal strength in her arm and endures post-trauma injuries that cause both physical and emotional damage.

2.      Brengle has been a professional tennis player on the WTA Tour since 2007. During the course of Brengle's professional career, she has been ranked as high as number 35 in

the world in singles and number 86 in doubles.  Brengle's prize winnings over her career total nearly $2 million.

3.     Brengle suffers from a rare medical condition known as Complex Regional Pain Syndrome ("CRPS") Type I.  CRPS is manifested by chronic pain, which usually affects a person's arm or leg.  Brengle's CRPS is induced by venipuncture (*i.e.*, the process of obtaining intravenous access to blood through a person's vein).  Venipuncture is one method of drawing blood from a person's body for testing.

4.      When Brengle is subjected to venipuncture blood testing, the procedure causes extreme pain as well as swelling, numbness and bruising in and around the vicinity of the injection site.  The procedure also causes Brengle severe anxiety due to the anticipatory fear of the excruciating pain that the venipuncture blood draw will cause her.

5.     WTA over a significant period of time forced Brengle, a WTA member (a necessity for Brengle to make a living as a professional tennis player), to undergo venipuncture blood testing despite WTA knowing about, and witnessing the consequences of, the effects of the procedure on Brengle.  While WTA mandates that each of its members complies with the ITF Limited a/k/a International Tennis Federation ("ITF")'s Tennis Anti-Doping Program (the "Anti-Doping Program") and accepts the authority of ITF to manage, administer and enforce the Anti-Doping Program, WTA also promises the procedures used will have no detrimental effect on members, either immediate or long-term.    In addition, WTA has a duty of good faith and fair dealing to every WTA member, including Brengle, in enforcing and administering the Anti-Doping Program.

6.     By forcing Brengle to undergo venipuncture blood testing and refusing to make reasonable accommodations, WTA caused Brengle to miss tournaments and to suffer, and has to

2

continue to cause Brengle to suffer, debilitating physical injuries and emotional trauma, violating both WTA's obligation to assure that Brengle would suffer no detrimental effects as a result of the administration of the Anti-Doping Program and WTA's duty of good faith and fair dealing owed to Brengle.

7.      In connection with its Anti-Doping Program, ITF mandates that professional tennis players provide blood samples upon demand.  ITF tests players by conducting both "in competition" and "out-of-competition" (also known as "whereabouts") tests.

8.      ITF does not provide notice in advance of venipuncture blood testing, whether in-competition or whereabouts, except when the testing is administered under the Athlete Biological Passport ("ABP") program.  With regard to whereabouts testing, a player must provide notice of a one-hour period each day when she will be available for testing.

9.      While stating in its Anti-Doping Program that the venipuncture blood test is "**obligatory,**" ITF promises each player as follows: "[t]he test will have **no** physical effect on [the player's] performance, i.e. you will be able to exercise immediately afterwards."  (Emphasis in original.)   ITF also is obligated to make "reasonable modifications to its blood sample collection procedures where necessary to address a medical condition."

10.      Due to the excruciating and incrementally worsening pain and suffering Brengle experiences each time she undergoes venipuncture blood testing, she repeatedly advised WTA, ITF and International Doping Tests & Management AB ("IDTM") that she cannot tolerate and should not be forced to undergo venipuncture blood draws.  Brengle further advised WTA, ITF and IDTM that venipuncture blood draws interfere with her ability to practice before tournaments and to compete in tournaments.

11.      In response, WTA, ITF and IDTM representatives on several occasions dismissed

Brengle's concerns and, instead, opined that Brengle has a phobia and suffers from a psychological fear of injections, and not from a medical condition causing extreme and debilitating physical pain from venipuncture injections.

12.     In November 2016, Brengle was formally diagnosed with CRPS Type I. Thereafter, she advised WTA, ITF and IDTM of the confirmed expert medical diagnosis.

13.     ITF requested that Brengle undergo an independent medical assessment with Charles E. Argoff, MD, a neurologist certified by the American Board of Psychiatry and Neurology, Inc. ("ABPN").

14.     In July 2017, Dr. Argoff examined Brengle and confirmed that she suffers from CRPS and that the condition is induced by venipuncture.  In Dr. Argoff's written report, he recommended that Brengle not be subject to venipuncture and, to the extent that Brengle must undergo anti-doping testing, that tests be performed without utilization of venipuncture.

15.     Other forms of blood testing that can effectively substitute for venipuncture are, and at all relevant times have been, available.

16.     Based upon Dr. Argoff's examination, in August 2017, ITF, the World Anti-Doping Agency ("WADA"), and the United States Anti-Doping Agency ("USADA") provided Brengle with a one-year conditional exemption from venipuncture blood testing after years of Brengle's pleas and requests.  Brengle, by that time, had suffered both temporary and permanent physical injuries, emotional trauma and lost earnings.

17.     The physical and emotional damage to Brengle resulting from the venipuncture testing and Respondent's conduct has been profound.  Brengle has been so severely harmed by Respondent's abusive conduct and medically inappropriate testing that she no longer is able to serve a tennis ball with her right arm at or near the same velocity that she has served throughout

her ten-year professional career, her hands are swelled and the swelling has at times spread throughout her arms, and her overall game has suffered enormously from the physical and emotional consequences she has endured.

18.     Had Respondent lived up to its promise to assure that the tests would cause no damage or harm to players, had Respondent listened to and taken seriously Brengle's substantive and emotional pleas, and had Respondent consulted with qualified experts about the consequences to Brengle of the venipuncture testing, rather than dismissing her contentions as illegitimate, Brengle would not have suffered, and would not now be suffering, the injuries alleged herein.

19.     By this Demand for Arbitration, Claimant seeks to hold Respondent responsible for the injuries that she sustained due to their conduct and bad faith actions, in an amount yet to be fully determined but believed to be in excess of $9 million.

## The Parties

20.     Claimant Brengle is an individual residing in Bradenton, Florida.

21.     Respondent WTA is a New York Not-For-Profit Corporation with its principal place of business located in St. Petersburg, Florida.  WTA is the governing body for professional women's tennis, with more than 2,500 members representing approximately 100 nations. WTA's annual official rulebook (the "WTA Rulebook") mandates that the ITF Anti-Doping Program governs participation at all WTA-sanctioned events and is binding upon all WTA players.

## Other Actors Working on Behalf of WTA

22.     ITF is a Bahamian company with its principal place of business in London, England.  ITF is the world governing body for the sport of tennis.  According to ITF's official

5

website, WTA is an affiliate of ITF, ITF Rules of Tennis apply to all WTA Tournaments and, since 2007, ITF has managed, administered and enforced the Anti-Doping Program on behalf of WTA.  All WTA players who compete in WTA events are bound by and required to comply with the ITF Rules of Tennis.

23.    IDTM is a Swedish company with its principal place of business in Stockholm, Sweden.  IDTM conducts sample collections and doping controls for international clients in the sports arena.  IDTM is responsible on behalf of ITF for collecting blood and other samples from athletes who participate in, among other events around the world, Grand Slam Tournaments and WTA tennis tournaments in Florida and elsewhere.  ITF contracts with IDTM as part of the management of ITF's anti-doping responsibilities.

24.    Stuart Miller is an individual who, upon information and belief, resides in London, England.  At all relevant times, Miller was employed by and acting on behalf of, and as an agent for, ITF, and as such, for WTA.  Miller is the Senior Director of Development and Integrity at ITF and its Anti-Doping Manager and has supervisory responsibilities in relation to the Anti-Doping Program.

25.    John Snowball is an individual who, upon information and belief, resides in London, England.  At all relevant times, Snowball was employed by and acting on behalf of, and as an agent for, IDTM, and as such, for WTA.  Snowball is the IDTM Doping Control Officer ("DCO").  Snowball has been involved in the collection of thousands of samples around the world for IDTM, including the Wimbledon Championships.  Snowball, among other duties and responsibilities, maintains an education manual and assists in training and supervising IDTM personnel in collecting blood and other samples from athletes for WTA and ITF.

**Jurisdiction and Choice of Law**

26.    The WTA Rulebook contains an arbitration provision that grants Brengle the right to arbitrate this dispute before the American Arbitration Association (the "Arbitration Agreement" and "AAA").

27.    Section XVIII of the WTA Rulebook is entitled "Final Dispute Resolution." Subsection A, entitled "Governing Law," states as follows:

> Any dispute between or among the WTA, WTA Tournaments, or WTA players (including, but not limited to matters concerning the arbitrability of disputes) arising out of the application of any provision of this Rulebook ("Dispute") shall be governed by the laws of the State of New York without reference to New York conflict of laws principles.

WTA Rulebook § XVIII.A.  Subsection B, entitled "Arbitration" states in relevant part:

> Any Dispute . . . which is not finally resolved by applicable provisions of this rulebook, shall be submitted exclusively to the AAA for final and binding arbitration before a single arbitrator with the Expedited Procedures of the AAA's Commercial Arbitration Rules in effect on the date that a demand for arbitration is filed with the AAA.

WTA Rulebook § XVIII.B.1.

**State and Federal Court Action**

28.    On April 9, 2018, Brengle sued the WTA, ITF, IDTM, Snowball and Miller in the Circuit Court for Manatee County, Florida.

29.    On May 8, 2018, WTA removed the lawsuit to United States District Court for the Middle District of Florida, Tampa Division, pursuant to 9 U.S.C. § 205, contending that the action, only with respect to WTA, is governed by the Arbitration Agreement.

30.    On May 15, 2018, WTA filed a Motion to Compel Arbitration and Stay the Case or, in the Alternative, Dismiss the Complaint (the "Motion to Compel Arbitration"), in which WTA referenced the WTA Rulebook and the Arbitration Agreement as its basis for seeking an order compelling the arbitration of the dispute.

31.     On June 8, 2018, Brengle moved for an order severing WTA claims and remanding to state court all claims against the non-WTA Defendants.  Brengle did not object to the Motion to Compel with respect to WTA.

32.     On June 25, 2018, the District Court issued an Order compelling arbitration with respect to WTA, staying claims with respect to WTA pending an arbitral decision, and remanding to the Circuit Court for Manatee County all remaining claims against the other Defendants.

## Factual Allegations

33.     Brengle is a 27-year-old professional tennis player.  She turned professional in 2007 at the age of 17.  Throughout her ten-year professional career, Brengle has never sustained a serious tennis injury.  Brengle has never tested positive for any banned substances, she has never missed or attempted to evade a test procedure, and she has never filed an inaccurate report of her whereabouts.

### *The WTA Rulebook*

34.     WTA, the governing body for professional women's tennis, sanctions national and international professional tournaments.

35.     Pursuant to Section III.A.1 of the WTA Rulebook, WTA assumes and demands responsibility "for processing all player applications for any Tournament, including Grand Slam events and notifying Tournaments of their player field in a timely fashion."

36.     Section III.A.3.b. of the Rulebook states:

> [t]he ITF may conduct anti-doping testing at WTA-sanctioned events under the ITF Tennis Anti-Doping Program (the "Anti-Doping Program"). . . . The WTA will honor and enforce any penalties or sanctions against players resulting from the Anti-Doping Program.  The Anti-Doping Program shall apply to and be binding upon

8

all players and shall govern participation in the events specified at Article 1 of the Anti-Doping Program, which includes all WTA-sanctioned events.  Players shall submit to the jurisdiction and authority of the ITF to manage, administer, and enforce the Anti-Doping Program and to the jurisdiction and authority of the Anti-Doping Tribunal and the Court of Arbitration for Sport to determine any charges brought under the Anti-Doping Program.

37.     Section III.A.3.c. of the WTA Rulebook states, "[e]ach calendar year, all players shall, as a condition of entering or participating in any event organized or sanctioned by the WTA, in conjunction with their execution of the Annual Player Form, consent and agree to comply with the Rulebook, Anti-Doping Program and Tennis Anti-Corruption Program."

***The Anti-Doping Program***

38.     ITF is the governing body of the game of tennis and its duties and responsibilities include determining the Rules of Tennis.  ITF partners with WTA to govern professional tennis. As part of ITF's rule-making responsibilities, ITF has created an anti-doping program (the "Anti-Doping Program").  WTA permits ITF to administer, govern, and enforce the Anti-Doping Program for the benefit of WTA.  The terms of the Anti-Doping Program are set forth in the ITF Tennis Anti-Doping Programme (the "Programme").

39.     According to Article 1.1 of the Programme, the purpose of the Programme "is to maintain the integrity of tennis and <u>to protect the health and rights of tennis players participating in Covered Events</u>."  (Emphasis added.)

40.     Article 1.2 of the Programme states, "[t]he ITF is a signatory to the World Anti-Doping Code (the "Code").  This Programme is adopted and implemented pursuant to the mandatory provisions of the 2015 version of the Code, as part of ITF's continuing efforts to keep doping out of tennis."

41.     Article 1.3.2 of the Programme states, "[t]he Programme, which includes the

appendices hereto, encompasses collection of Samples both In-Competition and Out-of-Competition . . . [.]"

42.     Article 1.10 of the Programme states in part, "[f]or purposes of this Programme, the following are 'Covered Events': The Grand Slam tournaments, Davis Cup, Fed Cup, Hopman Cup, the Olympic Tennis event… other IOC- recognized International Events, WTA tournaments and season-ending championships…ITF Pro Circuit tournaments…."

43.     Article 2 of the Programme defines which occurrences constitute an anti-doping violation under the Program.

44.     Article 2.3 of the Programme states that it is an anti-doping violation for an athlete to "[e]vad[e] Sample collection, or (without compelling justification) refusing or failing to submit to Sample collection after notification as authorized in applicable anti-doping rules."

45.     Article 4.6.1 of the Programme states, "[t]he ITF will designate one or more person(s), within or outside ITF, to administer and manage the ABP Programme on behalf of ITF (the 'Athlete Passport Management Unit,' or 'APMU'). ITF will also appoint suitably qualified, independent experts to form the Expert Panel for purposes of the ABP Programme."

46.     Pursuant to the definition section of the Programme, the "Athlete Biological Passport" is defined as "[t]he programme and methods of gathering and collating data as described in the International Standard for Testing and Investigations and the International Standard for Laboratories."

47.     Appendix 5 of the Programme, the "International Standard for Testing and Investigations," defines the term "passport" as a "collation of all relevant data unique to an individual Athlete that may include longitudinal profiles of Markers, heterogeneous factors unique to that particular Athlete and other relevant information that may help in the evaluation of

Markers."

48.     Additionally, in notices that ITF sends to athletes pursuant to the Anti-Doping Program concerning the selection of athletes to provide a blood sample at a tournament, ITF represents and warrants to players that "[t]he test will have **no** physical effect on [the athlete's] performance, i.e., you will be able to exercise immediately afterwards."  (Emphasis in original.) ITF also informs and promises to players, as it did to Brengle by correspondence dated March 2, 2017, that modifications of the testing procedures are available based upon medical need.  Annex B of the Programme at B 4.2.

***Brengle Endures an Unrelenting Course of Inappropriate and Tortuous Conduct in Connection with the Anti-Doping Program***

49.     Brengle has been wrongfully and unjustly forced to undergo venipuncture blood testing.

<u>At the 2009 Wimbledon, Brengle Sustains Physical Injuries from Venipuncture Blood Testing</u>

50.     In June 2009, at the Wimbledon Championships Grand Slam tournament in London, England, as part of the Anti-Doping Program, Brengle was required to undergo both blood and urine testing after she had completed competition.

51.     During the venipuncture blood draw, the phlebotomist's first two attempts to access the vein on the inside portion of Brengle's left elbow failed.  On the third attempt to draw blood, the phlebotomist accessed Brengle's vein, which collapsed almost immediately, and Brengle lost consciousness.

52.     Following the venipuncture, Brengle was immediately unable to straighten or bend her left arm.  She also experienced a sharp pain on the inside of her left elbow radiating from her elbow to her wrist.  Additionally, shortly after the venipuncture, Brengle suffered a panic attack.

53.     Due to the venipuncture at the 2009 Wimbledon, Brengle experienced painful bruising which continued well after she returned to Florida.  She also developed a hematoma while in Florida, which persisted for ten days.  For as long as five days after the venipuncture, Brengle could not play tennis without severe pain in her left arm, including when she returned to Florida and had intended to continue training.

<u>At the 2016 Australian Open, Brengle Again Sustains Injuries due to Venipuncture Blood Testing</u>

54.     In January 2016, Brengle entered the Australian Open Grand Slam tournament. Prior to commencement of the Australian Open, Brengle learned of a new blood passport for players, the ABP program.  The ABP program is intended to track each player's blood to create a baseline to follow the player's blood samples over time.

55.     Based on past experience, and fearing an adverse reaction to the venipuncture procedure, Brengle wrote to the ITF Anti-Doping Administrators, detailing her own horrific experiences, as well as similar reactions of other family members to the same test, and requested to have her blood drawn after she finished the Australian Open rather than before competition. Miller was dismissive of Brengle's request.  He stated that ITF would not grant any accommodation to her, rejecting that she had a "compelling justification."  Miller told Brengle, in sum, either to submit to the blood test or receive an anti-doping violation.

56.     Six days before Brengle's match at the Australian Open was scheduled to commence, Snowball supervised an attempt to collect blood from the inside portion of Brengle's right elbow.  Numbing cream was applied to the injection site.  As any qualified person would have known, numbing creams are ineffective to ameliorate or control symptoms caused by a condition of the sort from which Brengle suffers, and thus, unsurprisingly, the cream failed to provide any anesthetic relief for Brengle.

57.     During the blood test, the phlebotomist hit a nerve bundle in Brengle's arm.  The test could not be continued.

58.     After the failed venipuncture blood draw attempt, Brengle experienced hot pain radiating from the site of the venipuncture injection.

59.     Brengle was sent to the tournament physician, who recognized that Brengle was suffering from physical pain and trauma at and around the injection site.

60.     Because of the bruising and hematoma to the injection site, Brengle was unable to practice leading up to her match at the Australian Open.  Even two days before Brengle's first match, she could not maintain a grip on her racquet when making contact with the tennis ball.

61.     Indeed, despite six days between the date of her venipuncture blood draw and her first match, Brengle continued to lack full strength in her arm at the time of the match.  Further, she was unable fully to straighten her arm.

62.     Brengle's arm did not return to normal for two weeks after the venipuncture blood test and continued to compromise her health and training after she returned to Florida.

At the 2016 Wimbledon, Snowball Subjects Brengle to Outrageous Verbal Abuse and Brengle Sustains Further Physical Injuries Due to Venipuncture Blood Testing

63.     In June 2016, Brengle entered the Wimbledon Championships Grand Slam tennis tournament.

64.     The day following losing a match in the 2016 Wimbledon, Brengle went to the Prize Office, where Snowball informed Brengle that she was required to undergo a WTA-mandated blood test.  The blood test that Snowball ordered occurred after midnight following the end of competition in the Tournament for Brengle and thus was a prohibited targeted, out-of-competition drug test, in violation of the applicable Rules and Regulations governing drug testing procedures set forth in the Programme.

65.     In addition to the test violating the Programme because it was out-of-competition and "targeted" Brengle, Brengle also told Snowball, as she had told Snowball and other tennis officials on multiple previous occasions, that her blood should not be drawn due to her medical condition, which had already caused her considerable physical pain and emotional suffering.

66.     In response, Snowball screamed at Brengle, publicly called her a liar for claiming she had a medical condition that caused her physical pain from venipuncture blood draws and accused her of previously lying in this regard at the Australian Open.

67.     Thereafter, Brengle explained to the 2016 Wimbledon doctor that she could not have blood drawn from her arm.  The doctor would not agree to refrain from drawing blood but opted to administer the procedure on Brengle's foot rather than in her arm.

68.     Snowball, despite being aware of Brengle's obvious fragile emotional state, became increasingly verbally aggressive and abusive towards her.

69.     With a cavalier and dismissive attitude, Snowball decried to everyone in the room that someone should just put a blindfold over Brengle's eyes.

70.     By this point Brengle was crying.

71.     Despite witnessing Brengle's condition and reaction to what was occurring, Snowball continued verbally abusing her.

72.     Snowball then interrupted a discussion about numbing creams between Brengle and the Tournament Doctor and instructed the doctor to "just stick a needle in her."

73.     The Tournament Doctor used a smaller gauged needle to conduct the venipuncture blood draw.  Despite using the smaller gauge needle, Brengle experienced severe pain and bruising from the venipuncture.  Brengle also lost all sensation in her right leg from the kneecap down to the top of her ankle.

74.     The abuse from Snowball and her anticipation of the unbearable physical pain caused by venipuncture left Brengle distraught and in a state of fear and panic.

75.     After the test, Brengle requested a supplemental report form to complain about Snowball's unjustified, outrageous and abusive conduct toward her.

76.     Rather than apologize to Brengle for his conduct, Snowball continued to bully and threaten Brengle.

77.     In response to Brengle's request for a supplemental report form, Snowball threatened Brengle that if she said anything about him, then he would say worse things about her.

78.     Driven by the extreme physical pain and mental suffering Brengle needlessly and unjustly endured, she filled out the supplemental report form complaining of Snowball's misconduct.   Brengle then was forced to deliver the form directly to Snowball, who was responsible for collecting such forms on behalf of ITF.

79.     Brengle did not regain full sensation in her right leg or foot for over two weeks after the Wimbledon venipuncture blood test and well after she returned to Florida.  Brengle had difficulty walking and her ability to play tennis was significantly impaired during this time.

80.     Brengle continues to experience sharp pain in the vein from which the blood was collected at Wimbledon, as well as pain and decreased performance in the right foot.  Brengle transmitted a letter to ITF officials confirming these facts, along with photographs showing significant swelling and discoloration ten days after the test.

81.     In July 2016, approximately two weeks after the incident at Wimbledon, Miller responded to Brengle's letter.

82.     Incredibly, Miller claimed in his response that Brengle's behavior during the Wimbledon venipuncture blood test was unacceptable.   Miller further stated that ITF was

considering taking action against Brengle for her conduct at both Wimbledon and the Australian Open in connection with her venipuncture blood tests.

At the 2016 U.S. Open, Brengle Again Sustains Injuries from forced Venipuncture Blood Testing

83.     In August 2016, Brengle entered the U.S. Open Grand Slam tournament.  Around this time, she received an email regarding the ABP Program, which was applicable to the top 50 ranked women's players.  At that time, Brengle was ranked number 48 in the world.

84.     The notice stated that Brengle would be required to undergo venipuncture blood testing on a date certain prior to the U.S. Open.  In response, Brengle's representative contacted Miller to request moving the blood testing to an earlier date in order to reduce the severe effects venipuncture could have on Brengle's performance during the U.S. Open.

85.     Miller told Brengle's representative that it would cost thousands of dollars to do the blood testing earlier and inquired if Brengle would pay for an earlier test.

86.     Brengle agreed to accept financial responsibility for the test to be conducted earlier.  After she agreed, ITF refused to have the test administered earlier.

87.     Thereafter, ITF informed Brengle that she would be required to undergo the venipuncture blood test on the Saturday preceding the Monday when she was scheduled to begin playing at the U.S. Open.

88.     As a direct result of the extreme emotional and physical trauma that venipuncture blood sampling causes, Brengle was in an agitated state and unable to sleep for the five days preceding the blood test.

89.     Despite having to compete in a Grand Slam tennis tournament two days after the scheduled blood test, Brengle was medically prescribed an anti-anxiety medication (Valium) and a pain medication (Tramadol) to help alleviate her physical and psychological symptoms.

90.     Blood was collected from Brengle's right forearm less than 48 hours before she was scheduled to compete in her main draw singles match.  Upon insertion of the needle, Brengle experienced severe pain from her right forearm down to her right hand.  Swelling resulted from the venipuncture injection.

91.     After the blood test, Brengle attempted to practice.  Due to the pain and loss of strength and mobility in her right arm, she was unable to do so.

92.     On August 29, 2016, during her first match, Brengle continued to experience pain and loss of feeling in her right arm.  Due to the pain and other physical symptoms, Brengle was unable to complete the match and was forced to withdraw.

93.     The U.S. Open Tournament physician, Dr. Brian Daniels, examined Brengle on August 31, 2016.  Dr. Daniels confirmed that Brengle had "pronounced bruising at the access site" where blood was collected, and that she remained tender at the injection site.  Dr. Daniels also concluded that Brengle's condition "could be potentially devastating to her tennis career and quality of life."

94.     The physical and emotional damage sustained as a result of the test performed at the U.S. Open persisted long after Brengle returned to Florida.

***Brengle is Diagnosed with CRPS Type I***

95.     On November 17, 2016, Brengle was examined by Juan A. Ramos, M.D., an Anesthesiologist certified by the American Board of Anesthesiology.  Dr. Ramos has extensive experience in venipuncture-related nerve injuries and has published several articles on the subject.

96.     Following the November 17 examination, Dr. Ramos prepared a written report of his examination and findings.  ("Dr. Ramos's Report.")

97.     In Dr. Ramos's Report, Dr. Ramos explained that Brengle met the criteria for CRPS Type I at venipuncture sites.  Dr. Ramos reached this diagnosis by observing soft tissue changes, loss of range of motion and strength, disproportionate pain in reaction to the eliciting events, and extended duration of recovery after venipuncture blood testing, all of which Dr. Ramos observed was far beyond what is considered typical.

98.     Importantly, in his Report, Dr. Ramos explained that the "venipuncture incidents, and their physical consequences, may even put [Brengle] at risk of eventually developing longer lasting, or even permanent full-blown CRPS, with potentially devastating consequences both personally, emotionally and professionally.   These consequences could potentially include chronic debilitating pain and even loss of proper function of the affected extremity."

99.     Based upon the findings set forth in Dr. Ramos's Report, Dr. Ramos concluded that it was "rather urgent to find alternative methods to Ms. Brengle's blood testing."  Dr. Ramos further explained, "[m]ost illicit substances can be easily and accurately identified via non-evasive means such as saliva or hair testing."  He also found that "random measuring and trending of [Brengle's] hemoglobin and oxygen carrying capacity via non-invasive methods…would be reasonable and accurate alternatives [to venipuncture blood testing]."

***Brengle Again Seeks an Accommodation Exempting Her from Venipuncture Blood Testing***

100.    On or about January 30, 2017, Brengle's representative submitted a written request to Miller reiterating and reinforcing Brengle's previous requests for an accommodation from blood testing procedures. (The "January 30 Request.")

101.    In the January 30 Request, Brengle's representative outlined the bases for seeking the accommodation, reiterating the information Brengle had been consistently communicating. Brengle's representative explained that Brengle suffers from CRPS induced by venipuncture,

that the condition causes Brengle severe pain, swelling and numbness, which at times lasts for weeks after the needle insertion, and other longer-lasting consequences.  Brengle's representative reiterated that Brengle's CRPS symptoms are especially problematic when blood is collected by venipuncture within days of competition because she then lacks sufficient time to recuperate in time for competition.  Brengle's representative also advised ITF that the venipuncture was exposing Brengle to the very real potential for CRPS-associated permanent injuries.

102.    Brengle's representative highlighted the stark contrast in tournament results between when Brengle was subjected to venipuncture before a tournament and when she was not subjected to pretournament venipuncture.

103.    Brengle's representative advised ITF that, as a result of the venipuncture blood test two days before Brengle had been scheduled to play at the U.S. Open in 2016, Brengle had been prevented from practicing and was forced to default.

104.    Brengle's representative contrasted Brengle's considerable physical impairments at the U.S. Open with her performance at the ASB Classic (the "ASB") held on January 2-7, 2017.  At the ASB, venipuncture blood testing was not administered.  In this tournament, Brengle defeated Serena Williams, who was the number two ranked women's tennis player in the world at that time.

105.    On or about March 2, 2017, Miller responded to the January 30, 2017 request for an accommodation.  (The "March 2 Response.")

106.    In the March 2 Response, ITF finally acknowledged that Brengle suffered from CRPS Type I at venipuncture sites.

107.    Notwithstanding ITF's acknowledgement of Brengle's CRPS diagnosis, Miller stated in the March 2 Response that Brengle would <u>not</u> be exempted from venipuncture blood

testing.

108.    Miller further stated in the March 2 Response that, where reasonable, Brengle be provided modification to the blood testing, such as using a small-gauge needle, which already had proven to be ineffective in alleviating or mitigating the symptoms of Brengle's CRPS.

109.    On or about May 19, 2017, Miller sent a letter to Brengle's father, Daniel Brengle.  (The "May 19 Letter.")  The May 19 Letter was sent in response to the multiple e-mails and letters that Mr. Brengle had sent to ITF and other agencies in the prior months supporting Brengle's need for a medical exemption from venipuncture testing.

110.    In the May 19 Letter, Miller represented that ITF, WADA and USADA – presumably in coordination with and on behalf of WTF – proposed to make Brengle subject <u>only</u> to urine tests under each of their anti-doping programs until the 2017 U.S. Open, subject to Brengle agreeing to submit to an independent medical assessment ("IMA") prior to the 2017 U.S. Open, at her cost, by a medical professional nominated or agreed to by ITF, WADA and USADA.

111.    According to the May 19 Letter, the purpose of the IMA was to (a) evaluate any medical condition relating to Brengle's ability to provide blood samples and (b) establish how such condition could reasonably be treated.

112.    On July 10, 2017, Dr. Argoff, with the approval of the three organizations, performed the IMA.  In addition to being a certified neurologist by the ABPN, Dr. Argoff, a Professor of Neurology, also has ABNP Special Qualifications in Pain Management.

113.    In Dr. Argoff's July 18, 2017 Report ("Dr. Argoff's Report"), he reached conclusions consistent with Dr. Ramos's diagnosis from the previous November that Brengle suffers from CRPS Type I.

114.    Dr. Argoff's Report states that Brengle "presents with venipuncture induced CRPS."  Dr. Argoff further determined that Brengle met the "Budapest criteria for complex regional pain syndrome type 1 affecting the right upper extremity."  In addition, Dr. Argoff's Report states that Brengle "also had venipuncture-induced sensory changes following venipuncture anywhere in her body."

115.    Based upon his diagnosis, Dr. Argoff recommended, consistent with Dr. Ramos' recommendation over a half-year earlier, that Brengle "not be subject to venipuncture and in order to maintain professional activities she needs to have certain anti-doping testing performed . . . without venipuncture being utilized."

116.    In his Report, Dr. Argoff also explained that avoiding venipuncture is "essential to [Brengle's] health" and that "[i]t is clear that [Brengle's] body cannot tolerate venipuncture."

117.    Approximately one month after Dr. Argoff's examination of Brengle, on or about August 11, 2017, Miller sent a letter to Mr. Brengle (the "August 11 Letter").  In the August 11 Letter, Miller explained that ITF, WADA and USADA agreed to suspend venipuncture blood testing on Brengle for a period of 12 months from the date of the August 11 Letter.

118.    Pursuant to the August 11 Letter, Brengle would be required to submit to another independent medical assessment on or before August 1, 2018.  Additionally, during the one-year exemption period, Brengle would have to submit to further medical assessment if ITF, WADA or USADA considered that there were justified circumstances for such a request.

119.    Further, the August 11 Letter provides that after ITF, WADA and USADA receive the updated independent medical assessment, they – presumably in coordination with and on behalf of WTF – will decide whether to extend or rescind the blood testing accommodation. Furthermore, during the pendency of the 12-month venipuncture blood testing exemption,

Brengle would remain subject to the collection of urine samples.

120.    A few days after sending the August 11 Letter, on August 15, 2017, Miller sent an e-mail to Mr. Brengle.  In this e-mail, Miller wrote that "[t]he accommodation offered [in the August 11 Letter] is not an admission by ITF, WADA, or USADA that [Brengle's] condition was caused by previous venipuncture, by any of those organizations."

**The August 11 Agreement and Brengle's Privacy Rights are Violated**

121.    On February 14, 2018, a DCO from USADA arrived at Brengle's residence in the early morning hours and advised that a urine anti-doping test was required.

122.    As required for out-of-competition testing, Brengle had notified the various tennis organizations of the hour each day she would submit to testing.  The DCO came to her door after the time expired and as Brengle was leaving for a doctor's appointment.

123.    The DCO told Brengle that, since Brengle had opened her door, she was required to submit to the testing even though it was not timely.  Brengle insisted that she had to leave for the doctor's appointment.  In response, the DCO warned that if Brengle turned the DCO away, Brengle would be violated under the Anti-Doping Program.

124.    The DCO insisted on driving with Brengle to her doctor's appointment one hour away.  Shockingly, the DCO then insisted upon accompanying Brengle inside the treating room and witnessed the entire examination and listened in on Brengle's confidential conversations with her doctor, in violation of various medical privacy laws.

125.    After the appointment, the DCO drove back to Brengle's house with Brengle, where she administered a urine test.

126.    The next day, February 15, 2018, a DCO from IDTM came to Brengle's residence in the early morning.

127.    During out-of-competition testing, the Programme mandates that selection of athletes for testing must be done randomly.  Brengle is selected for testing far more frequently than most other athletes, in violation of the Anti-Doping Program.

128.    On this occasion, the DCO told Brengle that she was required to submit both to a venipuncture blood test and a urine test.  Brengle protested and said she would not submit to a blood test.  In response, the DCO warned Brengle that if she refused to comply with the blood test she would be deemed to have committed an anti-doping violation.

129.    A heated discussion ensued.  Brengle agreed to the urine test but adamantly refused the venipuncture blood draw.  Brengle also provided the DCO with a copy of the August 11 Letter as proof of the inappropriateness of the demand.  Brengle submitted to the urine test but refused to be subjected to the blood test.

130.    The incident caused Brengle significant anxiety and mental suffering.

**Defendants' Ongoing Harassment of Brengle**

131.    On April 17, 2018, a DCO from USADA arrived at Brengle's residence after the time window for testing had expired and demanded that Brengle undergo a urine anti-doping test.  Brengle, who had suffered a serious injury during a recent tournament, was again leaving for a doctor's appointment when the DCO arrived.  When informed of Brengle's pre-existing commitment, the DCO laughed and, referring to the above-described February 14, 2018, incident, stated: "Well, I've already come to one of [your] appointments before."

132.    The DCO threatened Brengle with a failed test despite having arrived outside the appropriate time period and despite the DCO's conduct.  Brengle agreed to the urine test before she left for the doctor so any escalation could be averted.

133.    The harassment continued.

134.    On June 1, 2018, Miller sent a letter to Brengle.  (The "June 1 Letter.")  The June 1 Letter falsely accused Brengle of violating the  Anti-Doping Program: there was an alleged "apparent failure to comply with the whereabouts filing requirements of the Programme" on May 25, 2018.  The June 1 Letter stated that ITF-designated testers had attempted to contact Ms. Brengle twice by telephone during the relevant time period (the "May 25 Time Period") without success.

135.    Miller attached to the June 1 Letter an Unsuccessful Attempt Form indicating incorrectly that the designated location was a "business location."

136.    Brengle, however, had properly and accurately made a Whereabouts Filing to the ITF regarding the time period in question, including the May 25 Time Period.  Brengle was at the designated location, a residential apartment building in Suresnes, France, throughout the May 25 Time Period when ITF-designated testers claim that she was not present.

137.    The admission that the ITF-designated testers went to a business, rather than a residential, location evidences that they did not go to the correct location for the testing.

138.    The telephone records provided by Miller show that the ITF-designated testers made two "cancelled" calls, at 6:55 a.m. and 6:56 a.m., and that there were no other attempts to call during the May 25 Time Period.  The "cancelled" calls evidence that the calls were never completed and could not have been received by Brengle.

139.    Brengle's cellular telephone during the May 25 Time Period shows that she did not receive a telephone call from ITF-designated testers during this time and no such call went to voicemail.  Brengle's carrier's records will confirm that she did not receive any calls and that no telephonic efforts were made to contact Brengle during the May 25 Time Period.

140.    In addition, Brengle throughout the May 25 Time Period was in her room with her

tennis coach, who confirms that Brengle did not receive a telephone call from ITF-designated testers then or at any other time.

141.    In sum, the ITF-designated testers did not go to the correct location and did not properly attempt to contact Brengle, either using the apartment intercom or by telephone.

142.    The June 1 Letter is part of continuing harassment of Brengle in response to her challenge to the abuse she suffered as a result of Defendants' actions herein alleged.

***Brengle's Ongoing Injury and Continued Suffering***

143.    Brengle continues to suffer from extreme swelling and a loss of strength and mobility in her right hand as a result of venipuncture, compromising her ability to play tennis and causing significant pain and mental suffering.

<strong><u>First Claim</u></strong><br><strong>(Battery)</strong>

144.    Brengle repeats and re-alleges paragraphs 1-143 of this Demand as if fully set forth herein.

145.    In requiring Brengle to undergo venipuncture blood testing, WTA intended to cause, or was wantonly unmindful of causing, or reckless in causing, harmful or offensive physical contact with Brengle, and intended to place, or was unmindful of placing, or was reckless in placing, Brengle in apprehension of such contact.

146.    As alleged above, in performing, ordering, directing and being responsible for the venipuncture blood test on Brengle, WTA engaged in harmful and offensive contact with Brengle.

147.    As a result, Brengle suffered damages in an amount to be determined at trial.

## Second Claim
### (Intentional Infliction of Emotional Distress)

148.   Brengle repeats and re-alleges paragraphs 1-143 of this Demand as if fully set forth herein.

149.   WTA engaged in extreme and outrageous conduct towards Brengle.

150.   WTA acted recklessly or with the intent to cause Brengle severe emotional distress.

151.   As a result, Brengle suffered severe emotional distress.

152.   As a result, Brengle suffered damages in an amount to be determined at trial.

## Third Claim
### (Negligence)

153.   Brengle repeats and re-alleges paragraphs 1-143 of this Demand as if fully set forth herein.

154.   WTA owed a duty of ordinary care to Brengle.

155.   WTA breached its duty of care to Brengle by failing adequately to protect the welfare and safety of Brengle, forcing Brengle to undergo venipuncture blood testing under the Anti-Doping Program.

156.   WTA breached its duty of care to Brengle by failing adequately to train and supervise its employees and other representatives who administer venipuncture blood testing to protect the welfare and safety of the athletes undergoing venipuncture blood testing under the Anti-Doping Program.

157.   WTA's breaches of its duty of care caused Brengle to suffer damages in an amount to be determined at trial.

**Fourth Claim**
**(Breach of Contract)**

158.     Brengle repeats and re-alleges paragraphs 1-143 of this Demand as if fully set forth herein.

159.     The WTA Rulebook, including successor versions, and other matters incorporated therein, is a valid, binding and enforceable contract between Brengle and WTA.

160.     The Programme, the terms of which are incorporated into the WTA Rulebook at Section III.A.3.b, states at Article 1.1 that the "purpose" of the Programme is to "protect the health and rights of tennis players participating in Covered Events."

161.     WTA materially breached its contract obligations to Brengle by failing to conduct a thorough and fair investigation of Brengle's medical condition, knowingly failing to protect Brengle from physical harm by forcing her to undergo venipuncture blood testing and subjecting Brengle to public ridicule and humiliation.

162.     Brengle has incurred, and will continue to incur, significant damage as a direct result of WTA's breach in an amount to be determined at trial.

**Fifth Claim**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

163.     Brengle repeats and re-alleges paragraphs 1-143 of this Demand as if fully set forth herein.

164.     The WTA Rulebook, including the Programme incorporated therein, is a valid, binding and enforceable contract between Brengle and WTA.

165.     All contracts, including the WTA Rulebook, impose an implied covenant of good faith and fair dealing.

166.     The implied covenant of good faith and fair dealing required WTA to honor the

reasonable expectations of the parties, to protect the rights of Brengle to receive the benefits and protections, including both the procedural and substantive protections, of the WTA Rulebook, and to act in a responsible and rational manner.

167.   Brengle complied with all of her obligations under the WTA Rulebook.

168.   WTA materially breached and violated its obligations under its implied covenant of good faith to Brengle by, *inter alia*, failing to conduct a thorough and fair investigation of Brengle's medical condition, knowingly failing to protect Brengle from physical harm by forcing her to undergo venipuncture blood testing, and subjecting Brengle to public ridicule and humiliation.  This constituted a breach of the express terms of the WTA Rulebook.

169.   Brengle has incurred, and will continue to incur, significant damage as a direct result of WTA's breach in an amount to be determined at trial.

<u>**Sixth Claim**</u>
**(Permanent Injunction)**

170.   Brengle repeats and re-alleges paragraphs 1-143 of this Demand as if fully set forth herein.

171.   Brengle will suffer immediate and irreparable harm if Respondent is not permanently restrained from subjecting Brengle to venipuncture blood tests.

172.   The potential permanent harm to Brengle from being subjecting to venipuncture blood tests is real and imminent and far outweighs the interests of Respondent.  The mere threat to perform a venipuncture blood draw upon Brengle causes her instant and devastating anxiety and disconcertion.

173.   The balancing of potential harms between Brengle and the Respondent favors Brengle over Respondent.

174.   Brengle has no adequate remedy at law against permanent physical injury and

gross disruption and setbacks to her career.

175.   Brengle has demonstrated a likelihood of success on her claims.

### Prayer for Relief

176.   Brengle respectfully requests the entry of an arbitral award in her favor, granting the following relief:

a.   entry of a Permanent Injunction restraining Respondent from performing and threatening to perform a venipuncture blood test on Brengle;

b.   damages in an amount to be determined by the Arbitration Panel, including compensatory and consequential damages, litigation and arbitration costs and administrative and attorneys' fees; and

c.   such other and further relief as deemed just and equitable under the circumstances.

Dated:  New York, New York
       July 24, 2018

  *s/ Peter R. Ginsberg*
PETER R. GINSBERG LAW, LLC
Peter R. Ginsberg
80 Pine Street, 33rd Floor
New York, New York 10005
Telephone: (646) 374-0030
Facsimile: (646) 355-0202
pginsberg@prglaw.com

*Attorneys for Claimant Madison Brengle*



**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

*For Consumer or Employment cases, please visit **www.adr.org** for appropriate forms.*

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

| | |
|---|---|
| Name of Respondent: WTA Tour, Inc. | Name of Representative (if known): Matthew Triggs |
| Address:<br>100 2nd Ave. S. | Name of Firm (if applicable): Proskauer Rose LLP |
| | Representative's Address: 2255 Glades Road, Suite 421 Atrium |
| City: St. Petersburg  State: FL  Zip Code: 33701 | City: Boca Raton  State: FL  Zip Code: 33431 |
| Phone No.: (727) 895-5000  Fax No.: | Phone No.: (561) 241-7400  Fax No.: (561) 241-7145 |
| Email Address: | Email Address: mtriggs@proskauer.com |

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:
As set forth in the attached Demand for Arbitration, Claimant, a professional tennis player, seeks damages and a permanent injunction against Respondent for its conduct, including claims for battery, intentional infliction of emotional distress, negligence, breach of contract, and breach of the implied covenant of good faith and fair dealing.

| Dollar Amount of Claim: $ 9,999,999.00 | Other Relief Sought:<br>☑ Attorneys Fees ☑ Interest ☑ Arbitration Costs<br>☐ Punitive/ Exemplary ☑ Other injunctive relief |
|---|---|

| Amount enclosed: $ 7,700.00 | In accordance with Fee Schedule: ☐ Flexible Fee Schedule ☑ Standard Fee Schedule |
|---|---|

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

Experience in commercial and complex civil litigation.

| Hearing locale: Bradenton, Florida | (check one) ☑ Requested by Claimant ☐ Locale provision included in the contract |
|---|---|
| Estimated time needed for hearings overall:<br>hours or 3 days | Type of Business: Claimant: Professional tennis player<br>Respondent: Principal organizing body of women's professional tennis |

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other? No

| Signature (may be signed by a representative): *Peter Ginsberg/lc* | Date: July 24 , 2018 |
|---|---|
| Name of Claimant: Madison Brengle | Name of Representative: Peter R. Ginsberg |
| Address (to be used in connection with this case):<br>Peter R. Ginsberg Law LLC, 80 Pine Street, 33rd Floor | Name of Firm (if applicable): Peter R. Ginsberg Law LLC |
| | Representative's Address: 80 Pine Street, 33rd Floor |
| City: New York  State: NY  Zip Code: 10005 | City: New York  State: NY  Zip Code: 10005 |
| Phone No.: 646-374-0029  Fax No.: 646-335-0202 | Phone No.: 646-374-0029  Fax No.: 646-335-0202 |
| Email Address: pginsberg@prglaw.com | Email Address: pginsberg@prglaw.com |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as provided in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100 Voorhees, NJ 08043. At the same time, send the original Demand to the Respondent.

*Please visit our website at www.adr.org if you would like to file this case online. AAA Case Filing Services can be reached at 877-495-4185.*