# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

## CASE NO.: 8:21-cv-01069-VMC-JSS

DEPOSITORS INSURANCE COMPANY, and ALLIED PROPERTY & CASUALTY INSURANCE COMPANY

       Plaintiffs,

vs.

WTA TOUR, INC., and MADISON BRENGLE,

       Defendants.

_____/

## PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS

Depositors Insurance Company ("Depositors") and Allied Property & Casualty Insurance Company ("Allied") (collectively, "Plaintiffs"), move for judgment on the pleadings as to their complaint for declaratory relief against defendants WTA Tour, Inc. ("WTA") and Madison Brengle,[1] pursuant to Federal Rule of Civil Procedure 12(c), and Local Rule 3.01. In support of their motion, Plaintiffs provide the following statement of facts and incorporated memorandum of law.

_____

[1] Defendant Madison Brengle has stipulated to be bound by any judgment between Plaintiffs and WTA. (Stipulation to Be Bound by Any Judgment [D.E. 21].) As such, the motions of the parties in interest, WTA and Plaintiffs, will resolve this action as to all parties.

## INTRODUCTION

Plaintiffs' Complaint for Declaratory Judgment seeks a declaration that neither Depositors nor Allied have a duty to defend WTA in an action brought by Madison Brengle, a professional tennis player, against WTA for blood testing mandated by the WTA.  The primary Depositors policy contains an exclusion that precludes coverage for "bodily injury" arising out of professional services, including medical services or any other health service. The Allied umbrella policy, for its part, follows form to the primary policy, integrating the exclusion.

In her underlying Arbitration Demand against WTA, Brengle alleges that she was subjected to blood testing that caused her extreme pain, swelling, numbness, and bruising due to a rare but medically-diagnosed physical condition. Plaintiffs offered a defense to WTA, subject to a reservation of rights and right to recoupment of fees and costs should there be no coverage under the policies. Plaintiffs and WTA dispute aspects of that offer of defense, but that dispute is not at issue in this motion.[2]

Because Brengle's Arbitration Demand purely concerns allegations for "bodily injury" arising out of the WTA's blood-testing mandate, a professional,

---

[2] The Parties agree that deciding Depositors' and Allied's defense obligations is a prerequisite to addressing WTA's counterclaim. (*See* WTA's Answer, Affirmative Defenses and Counterclaim [D.E. 09].) A judgment in favor of Plaintiffs granting this motion will preclude any entitlement to fees and costs that form the basis of WTA's counterclaim.

1017865\308961378.v1

medical service, and otherwise includes claims which are otherwise uncovered, Plaintiffs are entitled to judgment on the pleadings.

## STATEMENT OF MATERIAL FACTS[3]

1.      Depositors issued a Premier Businessowners Policy to WTA Tour, Inc., with policy number ACP BPOD 3016980284, which has effective dates from January 1, 2016 to January 1, 2017 ("Primary Policy"). A true and correct copy of the Primary Policy was attached to Plaintiff's complaint in this action as Exhibit A and, for convenience, is again attached here as **Exhibit A**.

2.      The Primary Policy provides, in pertinent part, the following insuring agreement:

### LIABILITY COVERAGE FORM

I.      **COVERAGES**

A.      **COVERAGE A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1.      **INSURING AGREEMENT**

a.      We will pay those sums up to the applicable Limit of Insurance that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages for which there is coverage under this policy.

HOWEVER, we will have no duty to defend the insured against any "suit" seeking damages for

---

[3] Plaintiffs' memorandum of law will reference the Statement of Material Facts as follows: "SMF ¶ ##."

1017865\308961378.v1

"bodily injury" or "property damage" to which this insurance does not apply.

\* \* \*

**b.**     This insurance applies to "bodily injury" and "property damage" only if:

**(1)**     The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"

\* \* \*

(*See* **Exhibit A**, Form PB 00 06 11 14, pp. 2-3 of 23.)

3.     The Primary Policy issued by Depositors provides, in pertinent part,

the following definitions:

**V.     DEFINITIONS**

\* \* \*

**3.**     **"Bodily injury"** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

\* \* \*

**13.**     **"Occurrence"** means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

(*See* **Exhibit A**, Form PB 00 06 11 14, pp. 19-21 of 23.)

4.     The Primary Policy issued by Depositors provides, in pertinent part,

the following exclusions:

**2.     EXCLUSIONS**

This insurance, including any duty we have to **defend "suits"**, **does not apply to:**

\* \* \*

**v.    Professional Services**

"Bodily injury" or "property damage" that arises out of or is a result of the rendering of, or failure to render, any professional service, treatment, advice or instruction.  This exclusion includes, but is not limited to, any:

* * *

**(4)**  Medical, surgical, psychiatric, chiropractic, chiropody, physiotherapy, osteopathy, acupuncture, dental, x-ray, nursing or any other health service, treatment, advice or instruction;

* * *

This exclusion applies even if the claims allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by an **insured, if the "occurrence" which caused the "bodily injury" or "property damage"** involved the rendering or failure to render of any professional service.

* * *

(*See* **Exhibit A**, Form PB 00 06 11 14, pp. 3, 12, 13 of 23.)

5.    Allied issued a Commercial Umbrella Liability Insurance Policy to WTA Tour, Inc., with policy number ACP CAP 3016980284, which has effective dates from January 1, 2016 to January 1, 2017 ("Umbrella Policy"). A true and correct copy of the Umbrella Policy was attached to Plaintiff's complaint in this action as Exhibit B and, for convenience, is again attached here as **Exhibit B**.

6.    The Umbrella Policy issued by Allied provides, in pertinent part, the following insuring agreements:

**A.    Coverage A – Excess Follow Form Liability Insurance**

**1.**    Under Coverage A, we will pay on behalf of the "insured" that part of "loss" covered by this insurance in excess of the total applicable limits of "underlying insurance", provided

the injury or offense takes place during the Policy Period of this policy.   The terms and conditions of "underlying insurance" are, with respect to Coverage A, made a part of this policy except with respect to:

**a.**   any contrary provision contained in this policy; or

**b.**   any provision in this policy for which a similar provision is not contained in "underlying insurance"

\* \* \*

**4.**   Notwithstanding anything to the contrary contained above, if "underlying insurance" does not cover "loss" for reasons other than exhaustion of an aggregate limit of insurance by payment of claims, then we will not cover such "loss".

**5.**   We have no obligation under this insurance with respect to any claim or "suit" settled without our consent.

\* \* \*

**B.**   **Coverage B – Umbrella Liability Insurance**

**1.**   Under Coverage B, we will pay on behalf of the "insured" damages the "insured" becomes legally obligated to pay by reason of liability imposed by law because of "bodily injury", "property damage", or "personal and advertising injury" covered by this insurance which takes place during the Policy Period and is caused by an "occurrence".  We will pay such damages in excess of the Retained Limit Aggregate specified in the Declarations or the amount payable by "other insurance", whichever is greater.

\* \* \*

**5.**   Coverage B will not apply to any loss, claim or "suit" for which insurance is afforded under "underlying insurance" or would have been afforded except for the exhaustion of the limits of insurance of "underlying insurance",

\* \* \*

(**Exhibit B**, Form UMB 00 02 04 13. pp. 2-3 of 20.)

7.   The Umbrella Policy issued by Allied provides, in pertinent part, the following defense provisions:

6

**Applicable to Coverage A and Coverage B**

**A.**   We have the right and the duty to assume control of the investigation, settlement or defense of any claim or "suit" against the "insured" for damages covered by this policy:

   **1.**   under Coverage A, when the applicable limit of "underlying insurance" has been exhausted by payment of claims; or

   **2.**   under Coverage B, when damages are sought for "bodily injury", "property damage", or "personal and advertising injury" to which no "underlying insurance" or other insurance applies.

* * *

**C.**   In those circumstances where paragraph A. above does not apply we do not have the duty to assume control of the investigation, settlement or defense of any claim or "suit" against the insured.   We do, however, have the right to participate in the investigation, settlement or defense of any claim or "suit" that we feel may create liability on our part under the terms of this policy.   If we exercise this right, we will do so at our expense.

* * *

(**Exhibit B**, Form UMB 00 02 04 13, pp. 3-4 of 20.)

   8.   The Umbrella Policy issued by Allied provides, in pertinent part, the following definitions:

**DEFINITIONS**

**A.   Applicable to Coverage A and Coverage B**

   As used in Coverage A and Coverage B:

* * *

   **4.**   "Loss" means those sums actually paid in the settlement or satisfaction of a claim which the "insured" is legally

7

obligated to pay as damages because of injury or offense, after making proper deductions for all recoveries and salvage.

\* \* \*

**6.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**7.** "Other insurance" means a policy of insurance affording coverage that this policy also affords. "Other insurance" includes any type of self-insurance or other mechanism by which an "insured" arranges for funding of legal liabilities.

"Other insurance" does not include "underlying insurance" or a policy of insurance specifically purchased to be excess of this policy affording coverage that this policy also affords.

\* \* \*

**13.** "Underlying insurance" means the policy or policies of insurance listed in the Schedule of Underlying Insurance forming a part of this policy, including any type of self-insurance or alternative method by which the "insured" arranges for funding of legal liabilities that affords coverage that this policy covers.

"Underlying insurance" does not include any Extended Reporting Periods on the policies shown in the Declarations. Extended Reporting Periods must be endorsed onto this policy by us.

\* \* \*

**B.    Applicable to Coverage A Only**

As used in Coverage A:

1.    "Injury or damage" means any injury or damage covered in the applicable "underlying insurance" arising from an "occurrence".

\* \* \*

**C.    Applicable to Coverage B Only**

As used in Coverage B:

\* \* \*

8

**2.**   "Bodily injury" means physical injury, sickness or disease to a person and, if arising out of the foregoing, mental anguish, mental injury, shock or humiliation, including death at any time resulting therefrom.

\* \* \*

(**Exhibit B**, Form UMB 00 02 04 13, pp. 12-15 of 20.)

9.   The Umbrella Policy issued by Allied provides, in pertinent part, the following exclusions:

**Exclusions**

\* \* \*

**C.   Applicable to Coverage B Only**
Under Coverage B, this insurance does not apply to:

\* \* \*

**12.   Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" due to the rendering of or failure to render any professional service.  This includes but is not limited to:

\* \* \*

**e.**   Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;

**f.**   Any health or therapeutic service treatment, advice or instruction;

\* \* \*

**h.**   Any service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with diet, cardio-vascular fitness, body-building or physical training programs;

\* \* \*

(**Exhibit B**, Form UMB 00 02 04 13, pp. 9-11 of 20.)

10.     On April 9, 2018, Ms. Brengle filed a lawsuit in Manatee County, Florida, against WTA, among others, which was captioned, *Brengle v. WTA Tour, Inc., et al.*, Manatee County Circuit Court Case No. 2018-CA-001576. The case was removed to the United States District Court for the Middle District of Florida in the matter captioned *Brengle v. WTA Tour, Inc., et al.*, Case No. 8:18-cv-1126.

11.     Following a motion to compel arbitration by WTA and a motion to sever claims by Ms. Brengle, Ms. Brengle's lawsuit was referred to arbitration, culminating in her filing of the Arbitration Demand on July 24, 2018 (the "Demand"). A true and correct copy of the Demand was attached to Plaintiff's complaint in this action as Exhibit C and, for convenience, is again attached here as **Exhibit C**.

12.     The Demand asserts six causes of action against WTA: (1) battery; (2) intentional infliction of emotional distress; (3) negligence; (4) breach of contract; (5) breach of the implied covenant of good faith and fair dealing and; (6) permanent injunction. (*See* **Exhibit C**, ¶¶ 144-175.) Each of Brengle's causes of action are predicated upon venipuncture (i.e., the process of obtaining intravenous access to blood through a person's vein). (**Exhibit C**, ¶ 3, 12.)

13.     Ms. Brengle alleges that she suffers from a "rare medical condition known as Complex Regional Pain Syndrome ('CRPS') Type I. CRPS is manifested

1017865\308961378.v1

by chronic pain, which usually affects a person's arm or leg. Brengle's CRPS is allegedly induced by venipuncture." (**Exhibit C**, ¶ 3.)

14.     Ms. Brengle alleges that when she is subjected to "venipuncture blood testing, the procedure causes extreme pain as well as swelling, numbness and bruising at and in the vicinity of the injection site." (**Exhibit C**, ¶ 4.)

15.     Ms. Brengle alleges that WTA "forced" Ms. Brengle "to undergo venipuncture blood testing despite WTA knowing about, and witnessing the consequences of, the effects of the procedure on Brengle." (**Exhibit C**, ¶ 5.)

16.     WTA and its representatives "on several occasions dismissed Brengle's concerns and, instead, opined that Brengle has a phobia and suffers from a psychological fear of injections, and not from a medical condition causing extreme and debilitating physical pain from venipuncture injections," (**Exhibit C**, ¶ 11), until she received an independent medical opinion, which entitled her to a one-year exemption, however she had allegedly suffered damage by that time, (**Exhibit C**, ¶¶ 16-18).

17.     Ms. Brengle alleges that WTA and its representatives assured her she would suffer no damages and denied her "reasonable accommodations" available under their stated policies. (**Exhibit C**, ¶¶ 5-11.)

1017865\308961378.v1

18.     Ms. Brengle alleges that venipuncture blood draws interfere with her ability to practice before tournaments and to compete in tournaments." (**Exhibit C**, ¶ 10.)

19.     Ms. Brengle identifies specific instances where WTA's venipuncture mandate caused her physical injury. (**Exhibit C**, ¶¶ 51, 56-58, 64, 73, 80, 90, 94, 126, 128, 130, 143.)

20.     Ms. Brengle alleges that she "has been wrongfully and unjustly forced to undergo venipuncture blood testing in (1) in June 2009, (2) in January 2016, (3) in June 2016, and (4) in August 2016. (*See* **Exhibit C**, ¶¶ 49-94.)

21.     Ms. Brengle alleges that "in performing, ordering, directing and being responsible for the venipuncture blood test on Brengle, WTA engaged in harmful and offensive contact with Brengle." (*See* **Exhibit C**, ¶ 146.)

<u>**MEMORANDUM OF LAW**</u>

## I.     STANDARDS OF LAW

### A.     STANDARD FOR MOTION FOR JUDGMENT ON THE PLEADINGS

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is appropriate where there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Perez v. Wells Fargo, N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014) (quoting *Cannon v. City of W. Palm*

12

Beach, 250 F.3d 1299, 1301 (11th Cir. 2001)); *Pinkston v. Univ. of S. Fla. Bd. of Trs.*, No. 8:18-cv-2651-T-33SPF, 2019 U.S. Dist. LEXIS 81564, at *2-3 (M.D. Fla. May 15, 2019). A Rule 12(c) motion for judgment on the pleadings is governed by the same standard as a Rule 12(b)(6) motion to dismiss. *See Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998). Like a Rule 12(b)(6) motion, a motion under Rule 12(c) must accept the nonmovant's allegations as true. *Pinkston*, 2019 U.S. Dist. LEXIS 81564, at *3.

### B.   STANDARD FOR THE DUTY TO DEFEND

"Florida courts have held that an insurer's duty to defend arises when a complaint filed against an insured alleges facts within the scope of the policy's coverage." *Underwriters at Lloyds London v. STD Enterprises, Inc.*, 395 F. Supp. 2d 1142, 1147 (M.D. Fla. 2005) (citing *Trizec Props., Inc. v. Biltmore Constr. Co.*, 767 F.2d 810, 811 (11th Cir. 1985)). "Therefore, the duty to defend is a question of comparing the underlying complaint to the policy. *See Auto Owners Ins. Co. v. Travelers Cas. & Surety Co.*, 227 F. Supp. 2d 1248, 1258 (M.D. Fla. 2002). Insurers must defend only when the operative pleadings allege specific facts that fairly bring the case within coverage. *Pioneer Nat'l Title Ins. Co. v. Fourth Commerce Props. Corp.*, 487 So. 2d 1051, 1054 (Fla. 1986).

1017865\308961378.v1

### C.   STANDARD FOR DUTY TO INDEMNIFY

"Under Florida law, an insurer's duty to indemnify is determined by analyzing the policy coverages in light of the actual facts of the underlying case." *STD Enterprises, Inc.,* 395 F. Supp. 2d at 1147; *Auto Owners Ins. Co.,* 227 F. Supp. 2d at 1258. Thus, in order for a duty to indemnify to arise, "the insurance policy *must cover* the relevant incident." *Id.* at 749 (emphasis added).  And while federal district courts may decline to decide the duty to indemnify prior to a judgment, "the exception to this general principle is if the court can determine that the allegations in the complaint could under no circumstances lead to a result which would trigger the duty to indemnify." *Mt. Hawley Ins. Co. v. Miami River Port Terminal*, 228 F. Supp. 3d 1313 1325 (S.D. Fla. 2017) (quoting *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1360 (M.D. Fla. 2001)). "In other words, 'a court's determination that the insurer has no duty to defend *requires* a finding that there is no duty to indemnify. *Miami River Porter Terminal*, 228 F. Supp. 3d at 1326 (quoting *Trailer Bridge, Inc. v. Illinois Nat'l Ins. Co.*, 657 F.3d 1135, 1146 (11th Cir. 2011)).

## II.   LEGAL ARGUMENT

### A.   PROFESSIONAL SERVICES EXCLUSIONS HAVE BEEN ROUTINELY UPHELD BY COURTS.

Florida Courts have routinely upheld professional services exclusions like the one at issue.  *Alpha Therapeutic Corp. v. St. Paul Fire & Marine Ins. Co.*, 890 F.2d

368, 370-71 (11th Cir. 1989)); *Colony Ins. Co. v. Suncoast Medical Clinic, L.L.C.*, 726 F. Supp. 2d 1369, 1377-78 (M.D. Fla. 2010). (bodily injury arising from the rendering or failure to render medical services, treatment, advice, or instruction because the insured's alleged failure to have in place adequate policies, procedures, staff, and assistive technology to ensure performance of diagnostic tests and communication between medical personnel is an integral part of the medical services provided by the insured and therefore excluded by the professional services exclusion).

This Court upheld a similar exclusion in *Colony Insurance Co. v. Suncoast Medical Clinic, LLC*, 726 F. Supp. 2d 1369. In *Colony* the Court considered the application of a professional services exclusion against alleged failures in treatment by the insured clinic. The Court, finding the clinic's arguments unpersuasive, observed as follows:

> Decisions about hiring medical staff, purchasing diagnostic technology, and establishing diagnostic testing procedures and communication protocols for a medical facility by definition require the application of medical expertise. Without the application of medical skill, decisions regarding these matters would be ineffective if not disastrous. Such decisions are so integral to the provision of medical services and treatment that they cannot be unbundled; therefore, they trigger the Colony Policy Exclusions that preclude coverage for injuries arising from Suncoast's rendering or failure to render medical services and treatment.

*Id.* at 1378.

"When an insurance contract fails to explicitly define the term

'professional services,' Florida Courts have considered, among other things, whether the service involves specialized skill, requires specialized training, is regulated, requires a degree, and/or whether there is an entity that certifies or accredits persons or that sets forth standards of practice for the performance of those services." *Auto-Owners Ins. Co. v. E.N.D. Servs., Inc.*, No. 8:10-CV-2387-T30EAJ, 2011 U.S. Dist. LEXIS 144585, at *4 (M.D. Fla. Dec. 15, 2011) *aff'd*, 506 F. App'x 920 (11th Cir. 2013); *see Goldberg v. Nat'l Union Fire Ins. Co.*, 143 F. Supp. 3d 1283, 1297 (S.D. Fla. 2015) (quoting *E.N.D. Servs.*, 2011 U.S. Dist. LEXIS 144585) (concluding that banking constituted a professional services as a regulated industry); *see also Mason v. Liberty Mut. Ins. Co.*, 370 F.2d 925 (5th Cir. 1967) (upholding a no-coverage judgment that a professional services exclusion precluded coverage for damages because of an injection);[4] *Evanston Ins. Co. v. Budget Grp., Inc.*, 199 F. App'x 867, 868 (11th Cir. 2006) (unpublished) (recognizing that if the act either involves a learned profession or requires specialized training it is a professional services).

Courts in other jurisdictions have similarly applied the exclusion and upheld judgments in cases where professional services defined the claim. *See Nationwide Mut. Ins. Co. v. Bader & Assocs.*, No. 2:13-CV-00032-RWS, 2014 U.S.

---

[4] Decisions of the United States Fifth Circuit Court of Appeals handed down prior to October 1, 1981 are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

1017865\308961378.v1

Dist. LEXIS 7507, at *13 (N.D. Ga. Jan. 22, 2014) (concluding, in dicta, that a policy's similarly worded professional services exclusion would have independently precluded coverage for claims for violations for real estate services"); *Millers Cas. Ins. Co. v. Flores*, 876 P.2d 227, 229 (N.M. 1994) (holding that a similar professional services exclusion precluded coverage for damages because of a contraindicated injection).

## B.   CONDUCTING A VENIPUNCTURE TEST CONSTITUTES A PROFESSIONAL SERVICE.

The law in this circuit, under Florida law, and elsewhere, is clear that venipuncture testing constitutes a professional service. "Whether an act results from the nature of a professional service is determined by focusing upon the particular act itself, as opposed to the character of the individual engaging in the act." *Lindheimer v. St. Paul Fire & Marine Ins. Co.*, 643 So. 2d 636, 638 (Fla. 3d DCA 1994). Testing, mandating testing, are professional acts because they are medical in nature, performed by medical professionals, and are informed by medical decision making.

The Eleventh Circuit has concluded that blood testing constitutes a professional service. *Alpha Therapeutic*, 890 F.2d at 371. In *Alpha Therapeutic*, a technician failed to test blood properly due to a transcribing error, which caused the technician to perform less testing than required. This resulted in contamination and ultimate destruction of the claimant's plasma products. *Id.* at

17

369. The policy in question contained near identical base language precluding coverage for "damage caused by the providing or failure to provide any professional service." *Id.* Dispensing with the claimant's argument that the term "professional service" was somehow ambiguous, the court concluded "that the error of the medical technician was committed while performing a professional service." *Id.* at 370.

Other cases have found that injections and blood testing, or even clerical acts related to those tests constitute professional services. *See, e.g., Mason*, 370 F.2d 925 (professional services exclusion precluded coverage for damages because of an injection); *State Farm Fire & Cas. Co. v. Compliance Advantage*, 471 F. Supp. 3d 796, 803 (E.D. Ky. 2020) (finding that professional services exclusion precluded coverage where the insured's acts included "taking, performing and reporting laboratory results of blood and urine samples"); *Doe v. American Red Cross Blood Services*, 377 S.E. 2d 323, 326 (S.C. 1989) (holding that the transfusion of blood is a professional service); *Swassing v. Baum,* 195 Neb. 651, 658, 240 N.W. 2d 24, 28 (Neb. 1976) (holding that the drawing and typing of blood is a professional service); *see also Osborn v. Irwin Memorial Blood Bank*, 7 Cal. Rptr. 2d 101,  (Cal. Ct. App. 1992) ("[T]here is no question that donor screening and blood testing are "professional services" for purposes of MICRA."); *Jappell v. Arlington Health Found.*, No. 97-9631, 1998 Va. Cir. LEXIS 375, at *9 (Va. Cir. Ct. Dec. 2,

1998) (finding "that the alleged actions of the defendants in screening, procurement, and storage of blood is both health care and professional services.").

### C. The Demand Purely Concerns Claims for Damages Because of Bodily Injury Arising Out of WTA's Venipuncture Testing.

Ms. Brengle's demand seeks damages entirely arising out of WTA's venipuncture testing, so there can be no coverage under the Primary Policy. The Demand alleges causes of action, including battery, intentional infliction of emotional distress, negligence, which clearly arise out of the venipuncture testing. The remaining counts for breach of contract, breach of implied covenant of good faith and fair dealing, and Ms. Brengle's count seeking a permanent injunction, similarly arise out of the medical acts, however.

This Court has highlighted that "courts focus on the type of causal connection between the alleged act and the alleged injury to determine coverage." *St. Paul Fire & Marine Ins. Co. v. Medical Protective Co.*, No. 2:04cv0391-FTM, 2006 U.S. Dist. LEXIS 89422, at *16 (M.D. Fla. Dec. 8, 2006). In this regard, the professional services exclusion should be given the broadest possible reading because it includes  "arising out of" language. *Taurus Holdings, Inc. v. United States Fid. & Guar. Co.*, 913 So. 2d 528, 537 (Fla. 2005) (the words "arising out of" mean  originating from, having its origin in, growing out of or flowing from, or in short, incident to or having connection with).

The *Medical Protective Co.* case is instructive. There, the court considered covered for damages to a technician at a hospital assisting with a procedure. 2006 U.S. Dist. LEXIS 89422, at *9. The technician was lifting a patient back onto a bed after they had fallen, and injured his back in the process, as opposed to actually performing the procedure himself. He did this on the direction of a doctor. *Id.* On three cross-motions, the Court was required to consider whether coverage was afforded under a general liability policy excluding coverage for damages "arising out of" professional services (like the policies at issue here), or a professional liability policy providing coverage for damages "based on" the rendering of professional services. Reasoning that the language was functionally identical, the court concluded that where the general liability policy's coverage stopped, the professional liability policy's coverage started. *Id.* at 22.

Here, all Demand's allegations "arise out of" professional services, and, therefore, Depositors has no duty to defend WTA for the Demand. The Demand is replete with allegations that Ms. Brengle's damages all originate from have origin in, grow out of or flow from are incident to or have some connection to the venipuncture testing at WTA's direction and refusal to grant an accommodation. For example, the WTA forced Ms. Brengle to undergo the treatment. (SMF ¶ 15.) The WTA required this on multiple instances, (SMF ¶ 19), and WTA, despite its testing mandate containing allowance for accommodations, "on several

20

occasions dismissed Brengle's concerns and, instead, opined that Brengle has a phobia and suffers from a psychological fear of injections, and not from a medical condition causing extreme and debilitating physical pain from venipuncture injections." (SMF ¶ 16.)

Each cause of action seeks damages arising out of the venipuncture blood testing. In her count for battery, Ms. Brengle specifically alleges that "in performing, ordering, directing and being responsible for the venipuncture blood test on Brengle, WTA engaged in harmful and offensive contact with Brengle." (SMF ¶ 21.) She further alleges that WTA "breached its duty of care to Brengle by failing adequately to protect the welfare and safety of Brengle, forcing Brengle to undergo venipuncture blood testing," (**Exhibit C** ¶ 155), and "by failing adequately to train and supervise its employees and other representatives who administer venipuncture blood testing under the Anti-Doping Program (**Exhibit C** ¶ 155.) Even  Brengle's breach of contract count alleges that WTA "knowingly fail[ed] to protect Brengle from physical harm by forcing her to undergo venipuncture blood testing and subjecting Brengle to public ridicule and humiliation." (**Exhibit C** ¶ 161.) Brengle's implied covenant cause of action alleges that WTA failed "to conduct a thorough and fair investigation of Brengle's medical condition, knowingly failing to protect Brengle from physical harm by forcing her to undergo venipuncture blood testing." (**Exhibit C** ¶ 168.)

Even the temporary injunction, for which coverage can never lie in any event,[5] since that count does not seek damages, seeks to prevent future venipuncture blood testing. (**Exhibit C** ¶ 172.)

Simply put, there is no coverage under the Primary Policy because every cause of action, every item of damages, and indeed every facet of Brengle's Demand, arises out of WTA forcing Brengle to undergo venipuncture blood testing as part of its Anti-Doping Program. Brengle's physical harm and damage resulting from that harm, are consistently alleged to arise out of WTA's Anti-Doping Program and its alleged unwillingness to offer an accommodation—deviating from its own policies. Irrespective of the actual facts, WTA is alleged to have forced Brengle to undergo testing, and dismissed her medical condition, allegedly opining that she had a phobia. (SMF ¶ 16-17.)

### D.   There is No Coverage Under the Umbrella Policy Under Any Coverage Form.

Because there can be no coverage under the Primary Policy, the Umbrella Policy, which follows form, cannot provide any alternative coverage. The Umbrella Policy's Coverage A provides that "[t]he terms and conditions of 'underlying insurance' [i.e., the Primary Policy] are, with respect to Coverage A, made a part of this policy." (SMF ¶ 6.) Coverage B is similarly limited,

---

[5] *See Aetna Cas. & Surety Co. v. Hanna*, 224 F.2d 499 (5th Cir. 1955); *Reller, Inc .v. Hartford Ins. Co.*, 765 So. 2d 87 (Fla. 1st DCA 2000); *Garden Sanctuary, Inc. v. Insurance Co. of N. Am.*, 292 So. 2d 75, 76 (Fla. 2d DCA 1974).

employing an exclusion near identical to that of the Primary Policy. (SMF ¶ 9.)

For all the reasons that there is no coverage under the Primary Policy, there is no coverage under the Umbrella Policy. *See Fireman's Fund Ins. Co. v. Delores Kettleman*, No. 05-61880-CIV-MORENO, 2006 U.S. Dist. LEXIS 109552, at *5-6 (S.D. Fla. Sept. 7, 2006) (citing *Houbigant, Inc. v. Federal Ins. Co.*, 374 F.3d 192, 203 (3d Cir. 2004)).

### E.   With No Duty to Defend, Plaintiffs Have No Duty to Indemnify WTA.

The duty to defend is broader than the duty to indemnify. But the corollary to this rule is that, absent a duty to defend, there can be no duty to indemnify. *Trailer Bridge, Inc.*, 657 F.3d at 1146 ("[A] court's determination that the insurer has no duty to defend *requires* a finding that there is no duty to indemnify.).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter judgment on the pleadings in its favor, concluding that Depositors as the primary carrier and Allied as the umbrella carrier have no duty to defend, and consequently no duty to indemnify, WTA for the lawsuit brought against it by Brengle.

1017865\308961378.v1

HINSHAW & CULBERTSON, LLP

*s/ Logan G. Haine-Roberts*
Ronald L. Kammer
Florida Bar No. 360589
rkammer@hinshawlaw.com
Logan G. Haine-Roberts
Florida Bar No. 112005
lhaine-roberts@hinshawlaw.com
2525 Ponce de Leon Blvd.
Fourth Floor
Coral Gables, FL 33134
Telephone: 305-358-7747
Facsimile: 305-577-1063
*Counsel for Depositors Insurance Company and Allied Property & Casualty Insurance Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 8, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants and I certify that a copy has been mailed to Defendant, Madison Brengle, 3609 45th Terrace West, Unit 101, Bradenton, Florida 34210.

*/s/ Logan G. Haine-Roberts*
Logan G. Haine-Roberts
Florida Bar No. 112005
lhaine-roberts@hinshawlaw.com

1017865\308961378.v1