UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
CASE NO. 8:21-cv-01069-VMC-JSS

DEPOSITORS INSURANCE COMPANY and
ALLIED PROPERTY & CASUALTY
INSURANCE COMPANY,

     Plaintiffs,

v.

WTA TOUR, Inc., a corporation, and
MADISON BRENGLE, and individual,

     Defendants.

_____/

## DEFENDANT WTA TOUR, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS

Defendant WTA Tour, Inc. (the "WTA") submits this memorandum in opposition to Depositors Insurance Company ("Depositors") and Allied Property & Casualty Insurance Company's ("Allied") (collectively, "Plaintiffs" or the "Insurers") motion for judgment on the pleadings [ECF No. 37] (the "Motion").

### PRELIMINARY STATEMENT

Depositors issued a general liability insurance policy covering the WTA against claims seeking damages for "bodily injury" caused by an "occurrence" during the policy period (Allied issued an umbrella policy covering similar claims). The Insurers do not contest that the Underlying Action[1] against the WTA falls within the insuring

---

[1] The Underlying Action was initiated in state court, removed to this Court, and ultimately was arbitrated pursuant to this Court's order compelling arbitration. *See* Compl. ¶¶ 15-20.

agreements.  It clearly does.  Madison Brengle ("Brengle"), a professional tennis player and member of the WTA, seeks damages for injuries allegedly due to the WTA's negligence.  The Insurers initially reviewed the Underlying Action and Depositors (as primary insurer) agreed to defend the WTA, subject to a reservation of rights.  The Insurers now seek to avoid their duty to defend claiming that coverage is barred by the policies' professional services exclusion.  But their Motion is based on two fundamental errors.

First, the Insurers misconstrue the policies' professional services exclusion.  Contrary to well settled law that such exclusions must be construed narrowly, they claim the exclusion broadly applies to any claim that in any way relates to a professional service provided by anyone.  But the exclusion only bars coverage if three elements are met:  (i) professional services are actually rendered by an insured, (ii) the services so rendered require unique knowledge or skill or professional certification or accreditation, and (iii) the services are unique to the insured's business or profession (for example, an insured doctor providing medical services to her patient).  The exclusion has nothing to do with a case such as this in which the WTA (which organizes professional women's tennis) rendered no professional service to Brengle, lacks unique knowledge or skill in blood testing, and is not in the medical or blood testing profession; and where Brengle was neither a patient nor a client of the WTA. Rather, the WTA was alleged to have been negligent in failing to stop a third party from testing a WTA member, which is not excluded.

Second, the Insurers misstate the allegations of Brengle's claim.  Contrary to her allegations, the Insurers claim that the WTA conducted venipuncture (i.e., actually rendered the service).  But the arbitration demand (the "Arbitration Demand") is clear that WTA did not:  "ITF . . . conduct[s] anti-doping testing at WTA-sanctioned events . . . ."  Arb. Demand ¶ 36.  The only reasonable interpretation of the well-pled factual allegations of the Underlying Action are that all blood testing, and all decisions relating to blood testing, were conducted by a third party.  All the WTA allegedly did was fail to protect Brengle from the third party who was conducting the blood testing.

In short, Depositors was correct when it previously agreed to defend the WTA in the Underlying Action.  As a matter of law, the allegations contained in Brengle's Arbitration Demand trigger coverage.  The WTA is therefore entitled to judgment that Depositors had a duty to defend the WTA, and the Insurers' motion should be denied.

## THE ALLEGATIONS OF THE ARBITRATION DEMAND

Brengle alleges that she was injured as a result of blood testing (i.e., having a needle inserted in her vein for the purposes of taking blood as part of an anti-doping program).  But she does not allege that the insured, the WTA, administers blood tests as part of its business, nor does she allege that, in this instance, she was injured by a blood test administered by the WTA.  Rather, the essence of Brengle's action against the WTA is that it was negligent because it did not protect her from blood testing administered by a third party (e.g., ITF Limited a/k/a International Tennis Federation (the "ITF")).  Brengle acknowledges that deciding whether to exempt her was not even

3

a decision within the WTA's expertise.  In Brengle's words, the WTA failed to "consult[] with qualified experts about the consequences to Brengle of the [blood] testing." Arb. Demand ¶ 18.

The WTA is a not-for-profit organization in which Brengle is a member.  *Id*. ¶¶ 5, 21.  It is a "governing body for professional women's tennis" (*id*. ¶ 34), which "sanctions . . . professional [tennis] tournaments" and accordingly, WTA's role is to "process[] all player applications for any Tournament, including Grand Slam events" and to "notify[] Tournaments of their player field in a timely fashion." *Id*. ¶¶ 34-35. The WTA is not alleged to be a blood testing provider.  The WTA does not conduct blood testing, and does not have any employees that conduct blood testing.  The Arbitration Demand makes clear that a separate entity, ITF, conducts all blood testing: "ITF . . . conduct[s] anti-doping testing at WTA-sanctioned events . . . ." *Id*. ¶ 36.

Not only does the Arbitration Demand allege that ITF (not the WTA) conducts all blood testing, it also alleges that ITF (not the WTA) mandates blood testing:  "[i]n connection with **its** Anti-Doping Program, **ITF mandates** that professional tennis players provide blood samples upon demand." *Id*. ¶ 7 (emphasis added).  The Arbitration Demand is replete with well-pled allegations that make clear that <u>all</u> procedures or protocols regarding blood testing (including who to test, what type of test, where, when, how often to test—and whether to exempt from testing) are made and directed by ITF not by the WTA:

- "**ITF** mandates that professional tennis players provide blood samples upon demand." *Id*. ¶ 7 (emphasis added).

4

- "**ITF** informed Brengle that she would be required to undergo the venipuncture blood test on the Saturday preceding the Monday when she was scheduled to begin playing . . . ." *Id.* ¶ 87 (emphasis added).
- "**ITF** also informs and promises to players, as it did to Brengle by correspondence dated March 2, 2017, that modifications of the testing procedures are available based upon medical need." *Id.* ¶ 48 (emphasis added).
- "**ITF**, the World Anti-Doping Agency, and the United States Anti-Doping Agency, provided Brengle with a one-year conditional exemption from venipuncture blood testing . . . ." *Id.* ¶ 16 (emphasis added).

Consistent with those allegations, the Arbitration Demand confirms that when Brengle was ultimately exempted from testing, it was the ITF (not the WTA) that made the decision. *See id.* ¶ 117 (Miller, an ITF employee, sent a letter "explain[ing] that **ITF, WADA and USADA** agreed to suspend venipuncture blood testing on Brengle for a period of 12 months") (emphasis added). The WTA only "mandates that each of its members compl[y] with the ITF['s] . . . Tennis Anti-Doping Program." *Id.* ¶ 5.

Tellingly, the Insurers ignore those allegations and instead mischaracterize the Underlying Action as seeking "damages entirely arising out of WTA's venipuncture testing." Mot. at 19. This is plain wrong. As shown above, the well-pled factual allegations of the Arbitration Demand — which is all that matters here — allege that ITF mandated and conducted blood testing, and the WTA simply did not step in and stop it – because, as Brengle acknowledges, the WTA does not have the expertise to make such decisions. *See id.* ¶ 18.

## ARGUMENT

### I.    An Insurer's Duty to Defend is Far Broader than Plaintiffs Suggest

Plaintiffs attempt to minimize their duty to defend by claiming that "[i]nsurers must defend only when the operative pleadings allege specific facts that fairly bring the

case within coverage." Mot. at 13.  But this is not the law.  Rather, their duty to defend is much broader.   Plaintiffs must defend when the complaint alleges facts that "potentially*"* bring "even one claim" within policy coverage.  *Hallums v. Infinity Ins. Co.*, 945 F.3d 1144, 1149 (11th Cir. 2019); *Land's End at Sunset Beach Cmty. Ass'n v. Aspen Specialty Ins. Co.*, 289 F. Supp. 3d 1259, 1265 (M.D. Fla. 2017) ("[I]f the underlying suit brings even one claim that falls within the scope of coverage, the insurer is obligated to provide a defense for the entire dispute.").  Where, as here, "an insurer relies on an exclusion to deny coverage, it has the burden to prove that the allegations of the complaint are cast *solely and entirely* within the policy exclusion and are subject to *no other reasonable interpretation*." *Northland Cas. Co. v. HBE Corp.*, 160 F. Supp. 2d 1348, 1359 (M.D. Fla. 2001) (citations omitted) (emphasis added).  If they cannot meet this heavy burden, the Insurers have a duty to defend.

Recognizing the heavy burden imposed by such standard, the Insurers attempt to confuse the issue by referring the Court to their duty to indemnify.  *See* Mot. at 14. But that is a separate issue for which a different standard applies. "While the duty to defend is broad and based on the allegations in the complaint, the duty to indemnify is determined by the facts adduced at trial or during discovery." *Penn. Lumbermens Mut. Ins. Co. v. Ind. Lumbermens Mut. Ins. Co.*, 43 So. 3d 182, 188 (Fla. 4th DCA 2010) (citation omitted).  Indemnification is not at issue here since the Underlying Action has not reached a final resolution, and therefore the indemnification standard is irrelevant. *See, e.g.*, *Mid-Continent Cas. Co. v. Delacruz Drywall Plastering & Stucco, Inc.*, 766 F. App'x 768, 770 (11th Cir. 2019).

**II.     The Insurers Misconstrue the Policy's Professional Services Exclusion**

**A.     The Depositors Policy's Professional Services Exclusion**

The Insurers' Motion rests on a faulty premise—that the exclusion applies whenever the Underlying Action relates to a professional service performed by *anyone*. They thus claim that the exclusion bars coverage here because "conducting a venipuncture test constitutes a professional service." Mot. at 17. But the issue is not whether the Arbitration Demand alleges an injury relating to a professional service conducted by anyone. The exclusion only applies when the only reasonable interpretation of the Arbitration Demand is that it solely and entirely alleges an injury arising out of the *WTA's* rendering or failure to render a professional service unique to the WTA's profession.

The analysis of the exclusion must begin with its plain language, which supports the WTA's construction. The Depositors Policy's professional services exclusion (the "Professional Services Exclusion") excludes claims for "[b]odily injury . . . that arises out of or is a result of the rendering of, or failure to render, any professional service, treatment, advice or instruction." *See* Depositors Policy § I(A)(2)(v), ECF No. 1-2 at 70-71.[2] By its plain language, the exclusion only applies if three distinct elements are met:  (i) the alleged injury arises out of "the rendering of, or failure to render" a

---

[2] The Allied Policy also has a professional services exclusion. *See* Allied Policy Insuring Agreements § A, ECF No. 1-3 at 9; *see also id.* Exclusions § (C)(12), ECF No. 1-3 at 17. The WTA did not move for judgment as to Allied's duty to defend because it is conditional; it must defend only once the Depositors Policy is exhausted. *Id.* Defense and Supplementary Payments, ECF No. 1-3 at 10-11. Because no such payments have been rendered, Allied does not have the present duty to defend. But it certainly is not entitled to a declaration that it cannot *ever* have a duty to defend.

"professional service"; (ii) that service requires specialized skill or knowledge; and (iii) that service is unique to the insured's profession. *See Laboss Transp. Servs., Inc. v. Global Lib. Ins. Co. of N.Y.*, 208 F. Supp. 3d 1268, 1276 (S.D. Fla. 2016) (citation omitted) (where policy does not define "professional services," courts have applied the "dictionary definition of 'professional,' which is '[a] person who belongs to a learned profession or whose occupation requires a high level of training and proficiency'"); *see also Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 898-99 (11th Cir. 2009) ("The majority of courts to address the issue have concluded that the term 'professional services' unambiguously refers to services unique to a specific profession and excludes the business aspects of a professional practice that a professional happens to perform."). As shown below, Plaintiffs cannot satisfy these elements.

Ignoring the plain language of the exclusion and case law interpreting exclusions, the Insurers claim that an overly broad interpretation of the Professional Services Exclusion must be adopted because the exclusion uses the phrase "arising out of." Mot. at 19 (contending the exclusion should be given the "broadest possible reading"). Not so. This exclusion—like any exclusion in an insurance contract—must be construed narrowly and not, as the Insurers contend, beyond its plain terms. *Demshar v. AAACon Auto Transp., Inc.*, 337 So. 2d 963, 965 (Fla. 1976) ("Exclusionary clauses in liability insurance policies are always strictly construed."). Indeed, a Florida appellate court expressly rejected the argument, similar to that being made by the Insurers here, that a professional services exclusion should be construed broadly. *See*

*Psychiatric Assocs. v. St. Paul Fire & Marine Ins. Co.*, 647 So. 2d 134, 138 (Fla. 1st DCA 1994) (rejecting insurer's "very broad construct of the 'professional services' exclusion" and noting that the insurer's construction "would result in the virtual emasculation of the policies, which are clearly intended to provide liability coverage for many different types of risks associated with the insureds' business").  Where, as in Plaintiffs' policies, an insurance policy does not define the term "professional services", but instead includes a non-exclusive list of examples, the term "professional services" should be given a restrictive meaning.  *See Hartford Cas. Ins. Co. v. New Hope Healthcare, Inc.*, 803 F. Supp. 2d 339, 346 (E.D. Penn. 2011); *Laboss Transp. Servs., Inc.*, 208 F. Supp. 3d at 1278 ("[T]he Policy fails to define 'professional services,' so the Court is obligated to construe the Policy in favor of coverage.").

Under the WTA's reasonable construction of the Professional Services Exclusion, that exclusion does not apply for three separate reasons. First, the WTA did not render any professional service unique to its business or profession.  Second, the WTA's alleged negligence did not involve something that requires specialized knowledge or technical expertise.  Third, Brengle did not allege that the WTA "render[ed] or fail[ed] to render" any service at all to her.

## B.    The Alleged Negligence is not Within the Scope of WTA's Business

The Professional Services Exclusion does not apply because the WTA did not render a service that is unique to its business or profession.  The WTA is not a blood testing company or medical services provider.  A professional services exclusion only

bars coverage for claims that arise in connection with the insured's profession.  *See* Samuel B. Rainey and John Zulkey, *Arising Out of Professional Services Professional Liability Policies and Exclusions*, 59 No. 5 DRIFTD 35 (May 2017) ("claims for failure to provide proper medical care do not arise from professional services when the insured is not a medical professional"); *see also Ins. Co. of State of Penn. v. Vimas Painting Co.*, No. 4:06-cv-1048, 2007 WL 1412988, at *14 (N.D. Ohio May 10, 2007) (exclusion does not apply where alleged negligence "relate[s] not to Defendant's profession of paint contractor, but to Defendant's alleged failure to provide primarily medical services"); *GRE Ins. Grp. v. Normandy Pointe Assocs.*, No. 18998, 2002 WL 360646, at *2 (Ohio Ct. App. Mar. 8, 2002) (exclusion inapplicable because insured's "profession . . . does not include engineering services").  This is consistent with the exclusion's purpose to preclude coverage for professional malpractice claims under general liability policies, because they are covered under a different type of insurance policy.  *See Recs. v. Aetna Life & Cas. Ins.*, 683 A.2d 834, 838-39 (N.J. App. Div. 1996).[3]

Here, the Underlying Action does not allege that the WTA is in the business of providing blood testing or that the WTA (or its employees) have any professional acumen in providing blood testing.  On the contrary, the Arbitration Demand makes

---

[3] Where, as here, the insured is not a medical professional, the insured would not carry professional liability insurance for claims arising out of medical services.  Indeed, a claim for medical malpractice does not exist in the absence of a medical service provider.  *See Nat'l Deaf Acad., LLC v. Townes*, 242 So. 3d 303, 309 (Fla. 2018) (whether a claim sounds in medical malpractice depends, in part, on "whether such diagnosis, treatment, or care was rendered by a provider of health care") (citation omitted).  As the WTA is not in the medical services business, no professional liability policy would provide coverage.  Applying the Insurers' construction of the Professional Services Exclusion would essentially render claims such as Brengle's uninsurable.

clear that the WTA and its employees do not have any such skills or training.  Arb. Demand ¶ 18.  Therefore, the exclusion does not apply to a claim alleging that the WTA failed to exempt Brengle from blood testing.

This Court's decision in *Colony* (upon which the Insurers rely) is in accord. There, the Court held that the professional services exclusion applied because the alleged negligence related to matters that were "an intricate part of the medical services provided by [the insured]." *Colony Ins. Co. v. Suncoast Med. Clinic, LLC*, 726 F. Supp. 2d 1369, 1376-77 (M.D. Fla. 2010).  By contrast, any alleged negligence by the WTA in connection with blood testing is not part of "the medical services provided by the WTA" – let alone an "intricate part" of those services – because the WTA is not alleged to be a medical provider that provides blood testing or any medical service.[4]

### C.   WTA's Alleged Negligence Did Not Involve Specialized Knowledge

The Insurers acknowledge that Florida law holds that a "professional service" means an act or service that "involves specialized skill, requires specialized training, is regulated, requires a degree, and/or [involves] an entity that certifies or accredits persons or that sets forth standards of practice for the performance of those services." Mot. at 16; *see also Laboss Transp. Servs., Inc.*, 208 F. Supp. 3d at 1276-77 ("A professional act or service is one arising out of a vocation, calling, occupation or

---

[4] The exclusion does not state that it applies to professional services rendered "by anyone."  The policies at issue were drafted by the Insurers, and had they intended it to so broadly apply, they were required to have made that clear in the language of the exclusion.

employment involving *specialized knowledge*, labor or skill, and the labor or skill involved is *predominantly mental or intellectual*, rather than physical or manual.").

In contrast, the WTA is not alleged to have engaged in any act involving specialized skill or training, or to have any sort of certification or accreditation. Brengle claims the WTA was negligent for "mandat[ing] that each of its members compl[y] with the ITF['s] . . . Tennis Anti-Doping Program" (*id.* ¶ 5) – because in doing so the WTA allegedly "fail[ed] to adequately protect the welfare and safety of Brengle." *Id.* ¶ 155.  But that was not a medical decision, it was not informed by medical decision making, and it was not made by a medical professional.  In short, it is not *professional* negligence as required to fall within the exclusion.  *See Scottsdale Ins. Co.*, 442 F. Supp. 2d at 1289-90 (rejecting insurer's argument that professional services exclusion applies because "the underlying complaint alleges a failure of the facility's duty to keep [the patient] safe, not of its duty to provide proper psychiatric treatment"). *See also Quintanilla v. Coral Gables Hosp., Inc.*, 941 So. 2d 468, 469 (Fla. 3d DCA 2006) (for medical malpractice, "[t]he injury must be a direct result of receiving medical care or treatment by the healthcare provider.") (citation omitted).  On the contrary, the Arbitration Demand asserts the WTA lacks the requisite medical expertise and should have "consult[ed] with qualified experts about the consequences to Brengle of the [blood] testing." *See* Arb. Demand ¶ 18.

## D.   WTA Did Not Render or Fail to Render a Professional Service

By its plain terms, the exclusion only applies to injuries arising out of the "rendering" or "failing to render" professional services.  The Insurers ignore these

significant words of the exclusion. The WTA did not render or fail to render any professional services to Brengle. She is a member of the WTA, not a patient or client who engaged the WTA to provide a service for compensation.

"The word 'render' . . . as generally understood clearly implies a second party to whom something (in this case a service) is 'rendered.'" *Vt. Mut. Ins. Co. v. Ciccone*, 900 F. Supp. 2d 249, 273 (D. Conn. 2012). Further, as case law confirms, in its usual connotation, this means providing services "on behalf of another" and "for which it could reasonably be expected some compensation would be due." *Nat. Gas Pipeline Co. of Am. v. Odom Offshore Surveys, Inc.*, 889 F.2d 633, 636 (5th Cir. 1989) (applying Louisiana law) (citation omitted). The language of the Depositors Policy is consistent with such an interpretation. While it does not define professional services, it offers examples including "legal," "engineering" and "medical." *See* Depositors Policy § I(A)(2)(v), ECF No. 1-2 at 70-71. The listed services have one thing in common— they are services provided to clients or patients of an insured for a fee. But neither of those circumstances holds true here. Brengle is a WTA member (not its client or patient) and there is no allegation that the WTA rendered any service to her, much less one for which Brengle paid the WTA or for which WTA expected compensation.

The Insurers suggest that *Medical Protective* somehow supports their position. But *Medical Protective* is entirely consistent with the above-stated general principles. There, the insured, a doctor, was performing surgical procedures on his patient – i.e., the insured was using his specialized training to render a professional service. 2006 U.S. Dist. LEXIS 89422, at *8-9. At the doctor's request, a cardiovascular technologist

assisted the doctor with lifting a patient on to the operating table and was injured. *Id.* The court found that the injury arose out of the doctor's performance of medical services upon his patient (presumably for a fee) and coverage was therefore excluded. *See Med. Protective Co.*, 2006 U.S. Dist. LEXIS 89422, at *24 (exclusion applied since "the acts that allegedly gave rise to liability in the case before this Court were done at the direction of a physician directly engaged in patient care").

Here, by contrast, the Insurers cannot establish that the WTA rendered or failed to render a professional service to Brengle. Thus, they cannot prove that Brengle's injury "arises from" the WTA rendering or failing to render a professional service. Rather, this case is akin to an employer requiring an employee to submit to drug testing administered by a third party. If an employee is injured during such drug testing, no one would say such injury arose out of the employer's professional services.

### E.     The Insurer's Own Case Law Confirms That They Seek to Stretch the Exclusion Beyond its Language and Intent

It should come as no surprise that in every case cited by the Insurers, where a court held that the professional services exclusion barred coverage, the allegedly negligent conduct causing injury (i) was a part of the specific business or services provided by the insured; (ii) involved the special knowledge of the insured; and (iii) occurred during the rendering of a service to a patient or customer of the insured. *See Alpha Therapeutic Corp. v. St. Paul Fire & Marine Ins. Co.*, 890 F.2d 368, 371 (11th Cir. 1989) (purchaser's claim against insured "in the business of providing human plasma to its customers," barred by a professional services exclusion where, due to plasma

14

seller's error in transposing figures during hepatitis testing, the insured sold blood containing hepatitis); *Mason v. Liberty Mut. Ins. Co.*, 370 F.2d 925, 926 (5th Cir. 1967) (patient's claim against infirmary barred by professional services exclusion where injury arose out of infirmary administering injection); *Millers Cas. Ins. Co. of Tex. v. Flores*, 876 P.2d 227, 230 (N.M. 1994) (patient's claim barred by professional services exclusion where insured is a doctor "in the business of providing medical services to patients," and injuries arose out of doctor's assistant administering contraindicated injection); *State Farm Fire & Cas. Co. v. Compliance Advantage, LLC*, 471 F. Supp. 3d 796, 802-03 (E.D. Ky. 2020) (customer's and patient's claim against laboratory testing services company barred by professional services exclusion because claim arose out of insured's (laboratory's) deficient blood and urine tests); *St. Paul Fire & Marine Ins. Co. v. Med. Protective Co.*, No. 2:04cv0391- FTM, 2006 U.S. Dist. LEXIS 89422, at *16 (M.D. Fla. Dec. 8, 2006) (technician's claim against insured doctor barred by professional services exclusion where injuries to technician assisting doctor arose out of doctor's rendition of medical services to a patient).[5]

The Insurers do not cite to *even one case* where the professional services exclusion barred coverage for alleged negligent conduct involving medical services that the insured did not provided, where the insured was not in the medical field, or where the

---

[5]Other cases cited by the Insurers do not address a professional services exclusion but likewise reinforce the point that professional medical negligence does not exist unless the negligent party is a medical service provider and services were ultimately provided to a patient.

insured lacked special knowledge, expertise, or certification in the medical profession, and undersigned counsel has found none.

The Insurers attempt to sidestep this issue, contending that the Arbitration Demand alleges the WTA failed to provide services that the Insurers characterize as medical (i.e., failing to consult with medical experts to understand Brengle's medical condition, failing to exempt Brengle from blood testing, or failing to supervise a third party conducting the blood testing, *see* Mot. at 20).  However, such allegations against an insured without professional acumen in providing medical services cannot cause the claims to come within the exclusion.  *See Vimas Painting Co.*, 2007 WL 1412988, at *13-14 (rejecting insurer's argument that exclusion applied because plaintiff was "essentially arguing that Defendant failed to provide mainly medical-related services to him" because insured "has no professional acumen in providing medical services . . . ."); *Emps. Reinsurance Corp. v. Newcap Ins. Co.*, 209 F. Supp. 2d 1184, 1193-94 (D. Kan. 2002) (rejecting assertion that security guards' decision to follow the hospital policy of calling 911 was a failure to render professional services because security guards "could not have provided professional health care services" because "they were not trained to provide such services").

## III.   The Insurers Misconstrue the Arbitration Demand

The Insurers' Motion should be denied for an independent reason — because they misconstrue the facts alleged in the Arbitration Demand.   The only professional

service alleged in the demand, blood testing, was administered by a third party, not the WTA.

As a "governing body for professional women's tennis," the WTA's roles in connection with professional tennis are: (i) to "process[] all player applications for any Tournament, including Grand Slam events;" and (ii) to "notif[y] Tournaments of their player field in a timely fashion." Arb. Demand ¶¶ 34-35.  The WTA is not alleged to conduct blood testing, and does not have any employees that conduct blood testing. On the contrary, the Arbitration Demand is clear that (i) "ITF . . . conduct[s] anti-doping testing at WTA-sanctioned events" (*id.* ¶ 36, emphasis added); (ii) "ITF mandates that professional tennis players provide blood samples upon demand" (*id.* ¶ 7, emphasis added); and (iii) ITF makes and directs all procedures or protocols regarding blood testing (including who to test, what type of test, where, when, how often to test—and whether to exempt from testing) (*id.* ¶¶ 7, 9, 16, 48, 87, emphasis added).

Plaintiffs try to create the misimpression that the WTA actually tested Brengle (for example, heading C actually refers to "WTA's Venipuncture Testing").  They go so far as to claim that "Ms. Brengle's demand seeks damages entirely arising out of WTA's venipuncture testing, so there can be no coverage . . . ."  Mot. at 19.  But the well pled allegations expressly refute that narrative:  "ITF . . . conduct[s] anti-doping testing at WTA-sanctioned events . . . ."  Arb. Demand ¶ 36; *see also id.* ¶¶ 7, 9, 16, 48, 87.  There is no well pled allegation that the WTA came anywhere close to testing its

players itself.  Instead, the allegations clearly establish that all the WTA did is require Brengle – like all other players – to submit to a drug testing program run by the ITF.

In an attempt to support their narrative, the Insurers seize upon a handful of conclusory allegations from the Arbitration Demand alleging that WTA "forced" Brengle to undergo venipuncture (*id.* ¶¶ 5, 6), "subject[ed]" Brengle to venipuncture (*id.* ¶ 1), and "requir[ed] Brengle to undergo venipuncture blood testing" (*id.* ¶ 145). In context, it is clear the Arbitration Demand uses these terms to refer to the fact that the WTA required Brengle to participate in the ITF's testing program (pursuant to which she was required to undergo blood testing) – and not to allege that WTA itself ever conducted (or required) any blood testing.   In any event, these conclusory allegations are contradicted by the specific and well-pled allegations of the Arbitration Demand alleging that ITF mandated and conducted venipuncture. By law, they should be disregarded.[6]  *See, e.g.*, *In re Complaint of Stone Petroleum Corp.*, 961 F.2d 90, 92 (5th Cir. 1992) ("Only the factual allegations of the pleadings are considered for purposes of analyzing the duty to defend. Mere conclusions are irrelevant.").  This is also true of the conclusory assertion that the WTA was negligent in "failing adequately to train and supervise its employees and other representatives who administer blood testing . . . ."   Arb. Demand ¶ 156.  The well-pled allegations of the Arbitration

---

[6] The Insurers also emphasize that paragraph 146 of Arbitration Demand states that "in performing, ordering, directing and being responsible for the venipuncture blood test on Brengle, WTA engaged in harmful and offensive contact with Brengle." *See* Mot. at 21.  This conclusory allegation is likewise contradicted by the well-pled allegations and should be disregarded. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Fla. Crystals Corp.*, No. 14-81134, 2015 WL 2374426, at *6 (S.D. Fla. 2015).

Demand are that the WTA has no supervisory role.  The WTA "accepts the authority of ITF to manage, administer and enforce the Anti-Doping Program" including any blood testing administered by ITF.  *Id.* ¶ 5.  And all decisions regarding testing were made by ITF, not the WTA.  *Id.* ¶¶ 7, 9, 16, 48, 87.

But even if the Arbitration Demand could be construed as alleging that the WTA provided some professional service (it cannot), the Insurers would still be required to defend because the Arbitration Demand clearly alleges that Brengle's injuries also arose out of the WTA's ordinary negligence.  Recall, an insurer who relies on an exclusion, must demonstrate "that the allegations of the complaint are cast *solely* and *entirely* within the policy exclusion and are subject to no other reasonable interpretation."  *Northland Cas. Co.*, 160 F. Supp. 2d at 1359 (citations omitted) (emphasis added).  Thus, Florida courts have held that an insurer is required to defend a medical service provider insured when, upon consideration of the operative pleading, it could be construed that the plaintiff's injury arose out of professional and non-professional negligence.  *See Estate of Tinervin v. Nationwide Mut. Ins. Co.*, 23 So. 3d 1232 (Fla. 4th DCA 2009) (affirming that insurer had duty to defend doctor in wrongful death claim because the operative pleading indicated that the injury arose out of both professional (doctor treatment) and non-professional negligence (clerical task of non-professional employee)); *Alicea Enters., Inc. v. Nationwide Ins. Co. of Am., Inc.*, 252 So. 3d 799, 801-02 (Fla. 2d DCA 2018) (making similar finding in pharmacist/customer context); *Scottsdale Ins. Co*, 442 F. Supp. 2d at 1290 (explaining that the only allegation that perhaps should be read to fall under the exclusion is abuse through chemical

restraints but "[e]ven if a larger portion of the claims would be excluded . . . as long as some of the claims give rise to coverage, Scottsdale owed Locktowns a defense").

As stated above, the overarching facts giving rise to Brengle's claim against the WTA are that it failed to exempt her from ITF's blood testing requirement. *See, e.g.*, Arb. Demand ¶¶ 5, 10, 18.  She faults the WTA for not reaching out to "qualified experts" about "the consequences" of the blood testing.  *Id.* ¶ 18.  These are not professional services, but instead they advance a claim that the WTA negligently disregarded her complaints as to the blood testing.  Because Brengle alleged that the WTA's ordinary negligence caused her alleged injuries, the Insurers have a duty to defend regardless of whether the Arbitration Demand could also be interpreted as including allegations that the WTA provided some professional service.

## CONCLUSION

For the reasons above, Plaintiffs' Motion should be denied.

*/s/* Jared M. DuBosar
Matthew Triggs
Florida Bar No. 865745
Jared M. DuBosar
Florida Bar No. 1011630
PROSKAUER ROSE LLP
2255 Glades Road, Suite 421A
Boca Raton, FL 33431
Tel: (561) 241-7400
Fax: (561) 241-7145
E-Mail: mtriggs@proskauer.com
E-Mail: jdubosar@proskauer.com
Secondary: florida.litigation@proskauer.com

John E. Failla*
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
Email: jfailla@proskauer.com
*Admitted *Pro Hac Vice*.

*Attorneys for Defendant WTA Tour, Inc.*