UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DEPOSITORS INSURANCE COMPANY and
ALLIED PROPERTY & CASUALTY
INSURANCE COMPANY,

    Plaintiffs,

v.                         Case No. 8:21-cv-1069-VMC-JSS

WTA TOUR, INC., and
MADISON BRENGLE,

    Defendants.

_____/

**ORDER**

    This matter is before the Court on consideration of the parties' cross motions for judgment on the pleadings, filed on September 8, 2021. (Doc. ## 37, 38). Both sides have filed responses and replies. (Doc. ## 41, 42, 49, 50). For the reasons explained below, Plaintiffs' Motion for Judgment on the Pleadings is denied and Defendant's Motion for Judgment on the Pleadings is granted.

## I.   <u>Background</u>

### A.   <u>The Underlying Arbitration</u>

Madison Brengle[1] is a professional female tennis player who has participated in the WTA Tour since 2007. (Doc. # 1-4 at ¶¶ 1, 2, 33). The WTA is the governing body for professional women's tennis and the entity that "sanctions national and international professional tournaments." (<u>Id.</u> at ¶¶ 21, 34). Depositors Insurance Company ("Depositors") issued a Premier Businessowners Policy to WTA Tour, Inc. (the "Primary Policy") and Allied Property & Casualty Insurance Company ("Allied") issued a Commercial Umbrella Liability Insurance Policy to WTA Tour, Inc. (the "Umbrella Policy"), both with effective dates of January 1, 2016 to January 1, 2017. (Doc. # 1 at ¶¶ 13, 14).

In April 2018, Brengle filed a lawsuit in Florida state court against WTA, ITF Limited a/k/a International Tennis Federation ("ITF"), International Doping Tests & Management AB ("IDTM"), Stuart Miller (an ITF employee), and John Snowball (an IDTM employee). (<u>Id.</u> at ¶ 15). The lawsuit was later removed to federal court, and WTA filed a motion to

---

[1] Brengle has stipulated that she will be bound by any order, judgment, or other ruling rendered in this matter. (Doc. # 21).

compel arbitration. (Id. at ¶¶ 16-17). In June 2018, the district court granted Brengle's motion to sever her claims against WTA from her other claims and further granted WTA's motion to compel arbitration as between Brengle and WTA. (Id. at ¶¶ 18-19).

On July 24, 2018, Brengle filed an Arbitration Demand against WTA with the American Arbitration Association (the "Demand"). (Id. at ¶ 20; Doc. # 1-4). According to the Demand, Brengle suffers from a rare medical conditional known as Complex Regional Pain Syndrome ("CRPS") Type I which is induced by venipuncture (the process of obtaining access to a person's blood through the veins). (Doc. # 1-4 at ¶ 3). When Brengle is subjected to venipuncture, it causes extreme pain, swelling, numbness and bruising, and Brengle also suffers from severe anxiety before blood draws due to these physical effects. (Id. at ¶ 4).

As the Demand explains, IDTM "is responsible on behalf of ITF for collecting blood and other samples from athletes" and "ITF contracts with IDTM as part of the management of ITF's anti-doping responsibilities." (Id. at ¶ 23). WTA has a Rulebook that mandates athletes' participation in ITF's Anti-Doping Program. (Id. at ¶¶ 21-22).

Specifically, the WTA Rulebook provides that:

> The ITF may conduct anti-doping tests at WTA-sanctioned events under the ITF Anti-Doping Program . . . . The WTA will honor and enforce any penalties or sanctions against players resulting from the Anti-Doping Program. The Anti-Doping Program shall apply to and be binding upon all players and shall govern participation in . . . all WTA-sanctioned events. Players shall submit to the jurisdiction and authority of the ITF to manage, administer, and enforce the Anti-Doping Program.

(Id. at ¶ 36).

Within the Demand, Brengle alleges that, prior to the 2016 Australian Open, she wrote to the ITF Anti-Doping Administrators about the painful effects she suffered after blood testing performed in 2009 and asked for an accommodation, which the ITF denied. (Id. at ¶¶ 53-55). Brengle was forced to undergo an attempted blood draw prior to the 2016 Australian Open, which left her arm bruised and painful and rendered her unable to practice. (Id. at ¶¶ 56-62). Brengle underwent venipuncture after she lost a match at the 2016 Wimbledon, resulting in extreme physical pain and an impairment of her ability to practice. (Id. at ¶¶ 64-80). Prior to the 2016 U.S. Open, Brengle requested that her venipuncture testing be moved to a date far in advance of the tournament, but ITF refused. (Id. at ¶¶ 83-87). Brengle had blood drawn from her arm less than 48 hours before she was scheduled to compete in her main draw singles match. (Id. at

¶ 90). She again experienced pain, bruising, loss of strength, and loss of mobility in her arm due to the venipuncture, and she was forced to withdraw from the match. (Id. at ¶ 92).

According to the Demand:

WTA over a significant period of time forced Brengle . . . to undergo venipuncture blood testing despite WTA knowing about, and witnessing the consequences of, the effects of the procedure on Brengle. While WTA mandates that each of its members complies with [ITF's] Anti-Doping Program and accepts the authority of ITF to manage, administer, and enforce the Anti-Doping Program, WTA also promises the procedures used will have no detrimental effect on members, either immediate or long term.

. . .

By forcing Brengle to undergo venipuncture blood testing and refusing to make reasonable accommodations, WTA caused Brengle to miss tournaments and to suffer . . . debilitating physical injuries and emotional trauma, violating both WTA's obligation to assure that Brengle would suffer no detrimental effects as a result of the administration of the Anti-Doping Program and WTA's duty of good faith and fair dealing owed to Brengle.

. . .

Had [WTA] lived up to its promise to assure that the tests would cause no damage or harm to players, had [WTA] listened to and taken seriously Brengle's substantive and emotional pleas, and had [WTA] consulted with qualified medical experts about the consequences to Brengle of the venipuncture testing, rather than dismissing her contentions as illegitimate, Brengle would not have suffered, and would not now be suffering, the injuries alleged herein.

(Id. at ¶¶ 5-6, 18).

Based on these allegations, Brengle brings claims against WTA for battery, intentional infliction of emotional distress, negligence, breach of contract, and breach of the implied covenant of good faith and fair dealing. (Id. at ¶¶ 144-169).

On May 4, 2021, Depositors and Allied filed a complaint for declaratory judgment in the instant action, seeking a declaratory judgment that, pursuant to the applicable insurance policies, neither Depositors nor Allied has a duty to defend WTA against the Demand and has no duty to pay for the attorneys' fees and costs expended in WTA's defense of the Demand. (Doc. # 1). WTA filed an answer and a counterclaim against Depositors for breach of contract, alleging that, by failing to defend WTA in the underlying arbitration, Depositors has breached its insurance contract with WTA. (Doc. # 9). Depositors filed an answer to the counterclaim. (Doc. # 23).

Depositors and Allied moved for judgment on the pleadings, and WTA contemporaneously moved for judgment on the pleadings against Depositors with respect to Count I of

the Complaint, which pertains to the Primary Policy.[2] (Doc.

## 37, 38). The cross motions have been fully briefed (Doc.

# 41, 42, 49, 50), and are ripe for review.

     **B.**     **The Insurance Policy Provisions**

          1. The Depositors Primary Policy

The Primary Policy provides in relevant part:

**I.**     **COVERAGES**
**A.**     **COVERAGE A — BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

     **1. INSURING AGREEMENT**
         a.   We will pay those sums up to the applicable Limit of Insurance that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages for which there is coverage under this policy.

            HOWEVER, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

            . . .

         b.   This insurance applies to "bodily injury" and "property damage" only if:

            (1) The "bodily injury" or "property damage" is caused by an "occurrence" that

---

[2] As WTA explains, it did not move for judgment as to Allied's duty to defend because Allied has no present duty to defend — it must defend only once the Depositors' Primary Policy is exhausted. (Doc. # 41 at 7 n.2).

takes place in the "coverage territory";
and
(2) The "bodily injury" or "property
damage" occurs during the policy period;
and
(3) Prior to the policy period, [the
insured and/or any employee of the
insured did not have knowledge that the
"bodily injury" or "property damage" had
occurred].

(Doc. # 1-2 at 64 (PB 00 06 11 14, at 2)).

Crucially, the Primary Policy also includes a section on
what is excluded from coverage under the policy:

2. **EXCLUSIONS**

This insurance, including any duty we have to
defend "suits," does not apply to: . . .

**v. Professional Services**

"Bodily injury" or "property damage" that arises
out of or is a result of the rendering of, or
failure to render, any professional service,
treatment, advice or instruction. This exclusion
includes, but is not limited to, any: . . .

(4) Medical, surgical, psychiatric,
chiropractic, chiropody, physiotherapy,
osteopathy, acupuncture, dental, x-ray,
nursing or any other health service,
treatment, advice, or instruction[.]

. . .

This exclusion applies even if the claims
allege negligence or other wrongdoing in the
supervision, hiring, employment, training or
monitoring of others by the insured, if the
"occurrence" which caused the "bodily injury"
or "property damage" involved the rendering or
failure to render of any professional service.

8

(Doc. # 1-2 at 65, 70, 71 (PB 00 06 11 14, at 3, 8, 9))

(hereafter, the "Professional Services Exclusion").

The Primary Policy contains these relevant definitions:

- ■ "Bodily injury" means bodily injury, sickness or disease sustained by a person, including any death resulting from any of these at any time.

- ■ "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

(Doc. # 1-2 at 81, 83 (PB 00 06 11 14 at 19, 21)).

## 2. The Allied Umbrella Policy

The Allied Umbrella Policy provides in pertinent part:

**A.   Coverage A – Excess Follow Form Liability Insurance**

1.   Under Coverage A, we will pay on behalf of the "insured" that part of "loss" covered by this insurance in excess of the total applicable limits of "underlying insurance", provided the injury or offense takes place during the Policy Period of this policy. The terms and conditions of "underlying insurance" are, with respect to Coverage A, made a part of this policy except with respect to:

  a.   any contrary provision contained in this policy; or
  b.   any provision in this policy for which a similar provision is not contained in "underlying insurance."

. . .

4.   Notwithstanding anything to the contrary contained above, if "underlying insurance" does not cover "loss" for reasons other than exhaustion of an

```
                 aggregate limit of insurance by payment of claims,
                 then we will not cover such "loss."

        . . .

        B.    Coverage B — Umbrella Liability Insurance
        1.    Under Coverage B, we will pay on behalf of the
              "insured" damages the "insured" becomes legally
              obligated to pay be reason of liability imposed by
              law because of "bodily injury", "property damage",
              or "personal and advertising injury" covered by
              this insurance which takes place during the Policy
              Period and is caused by an "occurrence." We will
              pay such damages in excess of the Retained Limit
              Aggregate specified in the Declarations or the
              amount payable by "other insurance," whichever is
              greater.

        . . .

        5.    Coverage B will not apply to any loss, claim or
              "suit" for which insurance is afforded under
              "underlying insurance" or would have been afforded
              except for the exhaustion of the limits of
              insurance of "underlying insurance."
```

(Doc. # 1-3 at 9 (UMB 00 02 04 13, at 2)).

The Umbrella Policy provides the following defense

provisions:

```
        Applicable to Coverage A and Coverage B

        A. We have the right and the duty to assume control of
           the investigation, settlement or defense of any claim
           or "suit" against the "insured" for damages covered
           by this policy:
              1.    under Coverage A, when the applicable limit of
                    "underlying insurance" has been exhausted by
                    payment of claims, or
              2.    under Coverage B, when damages are sought for
                    "bodily injury", "property damage", or
                    "personal and advertising injury" to which no
```

10

"underlying insurance" or "other insurance" applies.

(Doc. # 1-3 at 10 (UMB 00 02 04 13 at 3)).

The Umbrella Policy also provides the following exclusions:

**B. Applicable to Coverage B Only**

Under Coverage B, this insurance does not apply to:
. . .

12. Professional Services

"Bodily injury", "property damage", and "personal and advertising injury" due to the rendering of or failure to render any professional service. This includes but is not limited to: . . .

> e.  Medical, surgical, dental, X-ray or nursing services treatment, advice or instruction;
> f.  Any health or therapeutic service treatment, advice, or instruction; . . .
> h.  Any service, treatment, advice or instruction relating to physical fitness, including service, treatment, advice or instruction in connection with diet, cardio-vascular fitness, body-building or physical training programs[.]

(Doc. # 1-3 at 16, 17-18 (UMB 00 02 04 13 at 9, 10-11)).

## II.  <u>Legal Standard</u>

"After the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Federal district courts have applied a 'fairly restrictive standard in ruling on motions for judgment on the pleadings.'" <u>ThunderWave, Inc. v.</u>

11

Carnival Corp., 954 F. Supp. 1562, 1564 (S.D. Fla. 1997)
(quoting Bryan Ashley Int'l, Inc. v. Shelby Williams Indus.,
Inc., 932 F. Supp. 290, 291 (S.D. Fla. 1996)). "Judgment on
the pleadings is appropriate where there are no material facts
in dispute and the moving party is entitled to judgment as a
matter of law." Cannon v. City of West Palm Beach, 250 F.3d
1299, 1301 (11th Cir. 2001); see also Hawthorne v. Mac
Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998)
("Judgment on the pleadings is appropriate when there are no
material facts in dispute, and judgment may be rendered by
considering the substance of the pleadings and any judicially
noticed facts.").

"A motion for judgment on the pleadings is governed by
the same standard as a Rule 12(b)(6) motion to dismiss."
StoneEagle Servs., Inc. v. Pay-Plus Sols., Inc., No. 8:13-
cv-2240-VMC-MAP, 2015 WL 518852, at *1 (M.D. Fla. Feb. 9,
2015)(citations omitted); ThunderWave, 954 F. Supp. at 1564
("The standard of review for Rule 12(b)(6) and Rule 12(c)
motions are identical." (citations omitted)). "In determining
whether a party is entitled to judgment on the pleadings,
[the Court] accept[s] as true all material facts alleged in
the non-moving party's pleading, and [the Court] view[s]
those facts in the light most favorable to the non-moving

12

party." <u>Perez v. Wells Fargo N.A.</u>, 774 F.3d 1329, 1335 (11th Cir. 2014).

"If, on a motion under . . . [Rule] 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). "'The court has a broad discretion when deciding whether to treat a motion [for judgment on the pleadings] as a motion for summary judgment even though supplementary materials are filed by the parties and the court is not required to take cognizance of them.'" <u>StoneEagle Servs.</u>, 2015 WL 518852, at *2 (citations omitted).

Generally speaking, courts "will not consider matters outside the pleadings when passing on a Rule 12(c) motion." <u>Horsley v. Feldt</u>, 304 F.3d 1125, 1136 n.6 (11th Cir. 2002). An exception is that courts "may also consider documents attached to the plaintiff's complaint if they are (1) central to the plaintiff's claim and (2) undisputed." <u>Bank of Camilla v. St. Paul Mercury Ins. Co.</u>, 531 F. App'x 993, 994 (11th Cir. 2013). Here, the Court will consider the Complaint, WTA's Answer and Counterclaim, Depositors' Answer to the Counterclaim, and all attachments to the pleadings. Those attachments are central to this lawsuit and are undisputed.

### III. **Analysis**

The parties here agree that Florida law applies in this diversity action. (Doc. # 37 at 13; Doc. # 38 at 9 n.6).

Under Florida law, courts construe insurance contracts using their plain meaning. Garcia v. Fed. Ins. Co., 969 So.2d 288, 291–92 (Fla. 2007) (quotations omitted). However, insurance policies that are "ambiguous or otherwise susceptible to more than one meaning must be construed in favor of the insured." State Farm Mut. Auto. Ins. Co. v. Pridgen, 498 So. 2d 1245, 1248 (Fla. 1986). Because they tend to limit or avoid liability, exclusionary clauses are construed strictly against the insurer. Penzer v. Transp. Ins. Co., 545 F.3d 1303, 1309-10 (11th Cir. 2008); Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000). "When an insurer relies on an exclusion to deny coverage, it has the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation." Acosta, Inc. v. National Union Fire Ins. Co., 39 So.3d 565, 574 (Fla. 1st DCA 2010) (quotation omitted).

But where "a policy provision is clear and unambiguous, it should be enforced according to its terms whether it is a

14

basic policy provision or an exclusionary provision." Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co., 913 So. 2d 528, 532 (Fla. 2005). The fact that the policy does not provide definitions of certain terms does not automatically render the terms ambiguous. Cincinnati Ins. Co. v. Quorum Mgmt. Corp., 186 F. Supp. 3d 1307, 1316 (M.D. Fla. 2016).

Under Florida law, "[t]he duty to defend must be determined from the allegations in [the underlying action]." Jones v. Fla. Ins. Guar. Ass'n, Inc., 908 So. 2d 435, 443 (Fla. 2005) (citations omitted). In other words, the duty to defend "is determined solely by the allegations against the insured, not by the actual facts, nor the insured's version of the facts." Irvine v. Prudential Prop. & Cas. Ins. Co., 630 So. 2d 579, 579-80 (Fla. 3d DCA 1993) (citation omitted). Therefore, "[w]hen the actual facts are inconsistent with the allegations in the complaint, the allegations in the complaint control in determining the insurer's duty to defend." Baron Oil Co. v. Nationwide Mut. Fire Ins. Co., 470 So. 2d 810, 814 (Fla. 1st DCA 1985) (alteration added; citations omitted).

"The duty to defend arises when the relevant pleadings allege facts that fairly and potentially bring the suit within policy coverage." Stephens v. Mid-Continent Cas. Co., 749

F.3d 1318, 1323 (11th Cir. 2014) (quotation marks omitted).
"If the underlying suit brings even one claim that falls
within the scope of coverage, the insurer is obligated to
provide a defense for the entire dispute." <u>Land's End at
Sunset Beach Cmty. Ass'n v. Aspen Specialty Ins. Co.</u>, 289 F.
Supp. 3d 1259, 1265 (M.D. Fla. 2017). Any doubt about the
duty to defend must be resolved in favor of the insured. <u>Id.</u>

Here, the parties' dispute revolves around one issue:
whether the Professional Services Exclusion in the insurance
policies applies in this case. To revisit, the Exclusion in
the Primary Policy states that:

> This insurance, including any duty we have to
> defend "suits," does not apply to: . . .

> **v.   Professional Services**
> "Bodily injury" or "property damage" that
> arises out of or is a result of the rendering
> of, or failure to render, any professional
> service, treatment, advice or instruction.
> This exclusion includes, but is not limited
> to, any:
> . . .
> Medical, surgical, psychiatric, chiropractic,
> chiropody, physiotherapy, osteopathy,
> acupuncture, dental, x-ray, nursing or any
> other health service, treatment, advice, or
> instruction[.]

(Doc. # 1-2 at 65, 70, 71 (PB 00 06 11 14, at 3, 8, 9)).

Plaintiffs argue, and WTA does not dispute, that the
drawing of blood from a person's body is a medical or health-

related service or treatment within the meaning of the
Exclusion. (Doc. # 37 at 17-19); see also Mason v. Liberty
Mut. Ins. Co., 370 F.2d 925, 926 (5th Cir. 1967)[3] (holding
that professional services exclusion precluded coverage for
damages arising from an injection).

In the Arbitration Demand, Brengle alleges that WTA
harmed her by "forcing" her to undergo the blood draws,
refusing to make reasonable accommodations for her, and that
her injuries could have been avoided had WTA: (1) "lived up
to its promise to assure that the tests would cause no damage
or harm to players," (2) "listened to and taken seriously
Brengle's substantive and emotional pleas," and (3)
"consulted with qualified experts about the consequences to
Brengle of the venipuncture testing, rather than dismissing
her contentions as illegitimate." (Doc. # 1-4 at ¶¶ 5, 6,
18).

These alleged harms arose from WTA's decision to enforce
its Rulebook, which mandates that players comply with the
ITF's Anti-Doping Program.  This is a business decision on
the part of WTA rather than a professional service provided

---

[3] See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th
Cir. 1981) (adopting cases handed down by the former Fifth
Circuit as of September 30, 1981, as this Circuit's governing
body of precedent).

by the WTA. Thus, even if Brengle's claims do "arise out of" the venipuncture, they also arise in part from business decisions made by the WTA to enforce its policies. Such business decisions fall outside the Exclusion and, thus, Plaintiffs have a duty to defend WTA as to all claims. See Jones, Foster, Johnston & Stubbs, PA v. ProSight-Syndicate 1110 at Lloyd's, 680 F. App'x 793, 797 (11th Cir. 2017) ("[E]ven when the allegations in the complaint are partially within and partially outside the coverage of the policy, the insurer is obligated to defend the entire suit."); see also Scottsdale Ins. Co. v. Lock Towns Cmty. Mental Health Ctr., Inc., 442 F. Supp. 2d 1287, 1290 (S.D. Fla. 2006) ("Even if a larger portion of the claims would be excluded, however, as long as some of the claims give rise to coverage, Scottsdale owed Locktowns a defense.").

Other courts have refused to apply Professional Services Exclusions where the harm at issue arose at least in part from a business or administrative decision on the part of the insured. For example, in one case, after a man was discharged from the emergency room, he collapsed in the hospital's parking lot. Emps. Reinsurance Corp. v. Newcap Ins. Co. Ltd., 209 F. Supp. 2d 1184, 1186 (D. Kan. 2002). Hospital security guards, following the hospital's "Person Down Policy," called

18

for an ambulance instead of running back into the ER for a
stretcher and medical assistance, causing a harmful delay in
treatment. Id. at 1186-87. In ruling that the hospital's
settlement payment was not covered by the hospital's
professional liability coverage provision, the court wrote
that:

> [T]he security guards' decision to call 911 in
> compliance with hospital policy was not an omission
> in the furnishing of professional health care
> services. The security guards could not have
> provided professional health care services. . . .
> [H]ere, the focus should be on the "poorly
> conceived" Person Down Policy that resulted in Mr.
> Florence's injuries. . . . The formulation and
> implementation of the "poorly conceived" Person
> Down Policy was an administrative, business
> decision that . . . does not fit within the coverage
> of the HPL provision.

Id. at 1193-95.

The Employers Reinsurance court relied on a Fifth
Circuit decision that is also instructive here. In Guaranty
National Ins. Co. v. North River Ins. Co., there was a
coverage dispute arising out of an incident where a
psychiatric patient was placed in an "open" fourth floor room
(one without screens over the windows) and jumped through a
window to her death. See 909 F.2d 133, 134 (5th Cir. 1990).
In the subsequent lawsuit and coverage dispute, one of the
insurers of the hospital refused coverage, arguing that the

professional services exclusion in the CGL policy it issued
excluded any coverage. Id. The Fifth Circuit disagreed,
explaining that the "decision to protect the open unit
patients through screws in the window sashes rather than
through fixed, protective screens over the windows was an
administrative, business decision and was not a professional,
medical decision." Id. at 136.

Yet Plaintiffs try to wedge these business decisions by
the WTA into the Exclusion, arguing that WTA "engaged in
professional services in mandating the blood testing which
caused Brengle's alleged injuries, and it further engaged in
professional conduct when it allegedly refused to grant an
accommodation." (Doc. # 42 at 2). The Court, however, agrees
with WTA on this point – mandating an athlete submit to drug
testing required and administered by another organization is
not itself a "professional service" because that decision
does not involve the use of, or failure to use, any
professional skill, knowledge, experience or training. See
Goldberg v. Nat'l Union Fire Ins. Co. of Pittsburgh, 143 F.
Supp. 3d 1283, 1297 (S.D. Fla. 2015) (explaining that when
"professional services" are undefined, Florida courts
consider many factors, including "whether the service
involves specialized skill, requires specialized training, is

20

regulated, requires a degree, and/or whether there is an entity that certifies or accredits persons or that sets forth standards of practice for the performance of those services"); see also Auto-Owners Ins. Co. v. E.N.D. Servs., Inc., 506 F. App'x 920, 925 (11th Cir. 2013) (explaining that professional services are those which require specialized skill, training, or experience).

In sum, Depositors has not met its burden of demonstrating that the allegations in the Arbitration Demand are cast "solely and entirely within the policy exclusion." See Acosta, 39 So. 3d at 574. Accordingly, Depositors has a duty to defend WTA in the underlying arbitration.[4] Pursuant to Federal Rule of Civil Procedure 54(b), this Court may only direct entry of a final judgment as to fewer than all claims or parties if the Court determines that there is no just reason to delay entry of such final judgment. Here, while, the Court has granted WTA's motion for judgment on the pleadings as to Count I of the Complaint, multiple issues remain to be addressed, including Count II of the Complaint

---

[4] The Court takes no position on the insurers' duty to indemnify WTA, as that is a separate issue. See St. Paul Fire & Marine Ins. Co. v. Rosen Millennium, Inc., 337 F. Supp. 3d 1176, 1183 (M.D. Fla. 2018) ("An insurer's duty to defend is distinct from and broader than the duty to indemnify.").

21

as to Allied and WTA's counterclaim. Accordingly, the Court will not enter final judgment at this time. <u>See</u> Fed. R. Civ. P. 54(b).

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

Plaintiffs' Motion for Judgment on the Pleadings (Doc. # 37) is **DENIED.** Defendant's Motion for Judgment on the Pleadings as to Depositors Insurance Company (Doc. # 38) is **GRANTED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>14th</u> day of December, 2021.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE